## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

JAMES COLLINS and KEN NEWMAN,
individually and on behalf of all others
similarly situated,

      Plaintiffs,

      v.

FORD MOTOR COMPANY,

      Defendant.

C.A. No.

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs James Collins and Ken Newman, individually and on behalf of all others similarly situated, bring this class action against Defendant, Ford Motor Company. For their Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## SUMMARY OF THE ACTION

1.    Plaintiffs James Collins and Ken Newman ("Plaintiffs"), individually and on behalf of all others who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "proposed Class"), bring common law warranty claims and claims under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, N.Y. Gen. Bus. Law § 349, *et seq.*, and the Pennsylvania Unfair Trade Practices and Consumer Protection LAW ("UTPCPL"), 73 P.S. § 201-1, *et seq.*, against Defendant Ford Motor Company ("Ford" or "Defendant").

2.    This consumer class action arises from the defective design and manufacture of the tire valve stems and wheels of 2017 and 2018 Ford F-350 trucks and their variants that are equipped with aluminum alloy wheels (the "Class Vehicles").

3.      The Firestone tire recall in the late 1990s, which was linked to more than 100 deaths from rollovers following tire tread-separation, prompted the United States Congress to enact legislation mandating the use of Tire Pressure Monitoring System ("TPMS") technology in all light motor vehicles (under 10,000 pounds) to help alert drivers of under-inflation events. This legislation mandated that by 2008 all new passenger car models must be equipped with a TPMS.

4.      Every wheel of the Class Vehicles has a valve stem which is affixed to a TPMS sensor and which is the point at which pressurized air may be added into the tire. The tire valve stems of the Class Vehicles are made of a steel alloy while the wheels of the Class Vehicles are made of an aluminum alloy. The contact between the steel valve stem and the aluminum wheel causes galvanic corrosion at the point of contact which corrodes the aluminum. This corrosion causes leaks, thereby causing the tires to continuously lose air pressure (the "Defect").

5.      Low tire pressure caused by the Defect adversely affects the Class Vehicles' fuel economy, tire longevity, vehicle handling, and safety of the passengers and others. An instantaneous tire deflation or blowout can cause drivers to lose control of their vehicles. Low tire pressure is particularly harmful when using the Class Vehicles to haul or tow heavy loads, which the Class Vehicles are advertised as being capable of doing.

6.      Plaintiff Collins owns a 2018 Ford F-350 Lariat DRW. Plaintiff's vehicle experienced the Defect, forcing Plaintiff to refill his tires frequently, often daily. Plaintiff took his vehicle to a Ford dealership numerous times, resulting in inadequate repairs—including replacing the TPMS sensors, replacement of the wheels, and replacement of the tire valve stems—which did not remedy the root cause of the Defect. Plaintiff ultimately hired a third-party mechanic to replace the defective steel valve stems with rubber valve stems. However, Plaintiff's wheels are still discolored and corroded due to the original and replacement defective steel valve stems.

7.      Plaintiff Newman owns a 2018 Ford F-350 DRW XL. Plaintiff's vehicle experienced the Defect, forcing Plaintiff to refill his tires frequently, often daily. Plaintiff complained to a Ford dealership numerous times, but the dealership did not remedy the root cause of the Defect and told him that any repair would not be covered by the warranty. Plaintiff has paid out of pocket for numerous repairs performed by third-party mechanics. Plaintiff's wheels are still discolored and corroded due to the original and replacement defective steel valve stems.

8.      Numerous consumer complaints to Ford and the National Highway Traffic Safety Administration ("NHTSA") describe experiences similar to Plaintiffs'.[1] Moreover, these complaints plainly demonstrate that Ford is aware of the root cause of the Defect, but—in most cases—mandates an exclusive but ineffective repair knowing that the corrosion and tire deflation will continue for the life of the Class Vehicle.

9.      By warranting, advertising, and selling the Class Vehicle with a defective tire valve stem and wheel, Defendant engages in deceptive and unfair trade practices and breaches the express and implied warranties Plaintiffs and the proposed Class members relied upon in the purchase of the Class Vehicles.

10.     This case seeks protection and relief for the purchasers of the Class Vehicles for the harm they have suffered, and the safety risks they face, from the Defendant's unfair, unlawful, and deceptive trade practices.

## JURISDICTION AND VENUE

---

[1] *See, e.g.*, 2017 Ford F-350 Regular Cab, NHTSA, https://www.nhtsa.gov/vehicle/2017/FORD/F-350%252520REGULAR%252520CAB/PU%25252FRC/4x2; 2018 Ford F-350 Regular Cab, NHTSA, https://www.nhtsa.gov/vehicle/2018/FORD/F-350%252520REGULAR%252520CAB/PU%25252FRC/4x2.

11.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     This Court has general personal jurisdiction over Defendant because Defendant is incorporated in Delaware and is a resident of Delaware.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is subject to the Court's personal jurisdiction and is a resident of Delaware.

## PARTIES

14.     Plaintiff Collins is a resident of Pennsylvania.

15.     Plaintiff Newman is a resident of Florida.

16.     Defendant is a Delaware corporation with a principal place of business in Dearborn, Michigan. Defendant designs, manufactures, advertises, distributes, and sells vehicles throughout Delaware, the United States, and the world, including the Class Vehicles.

## PLAINTIFF FACTUAL ALLEGATIONS

### A.  Plaintiff Collins

17.     Plaintiff Collins ("Plaintiff" for purposes of this section) purchased a new 2018 Ford F-350 Lariat DRW from Fairway Ford in Canfield, Ohio on August 10, 2018 for $76,101.76.

18.     Plaintiff's vehicle is a dual-rear-wheel ("DRW" or "dually") variant such that it has two sets of two wheels on either end of the rear axle. The front wheels and the exterior rear wheels

are made of aluminum; the interior rear wheels are made of steel. Each wheel was equipped with a steel valve stem.

19.     Plaintiff relied on Ford's advertising, marketing, warranties, and representations concerning safety, performance, durability, capability, reliability, and towing capacity when purchasing his vehicle.

20.     Plaintiff previously worked as an auto mechanic and as a certified automotive diesel instructor. Plaintiff is now retired and often uses his vehicle to pull a fifth-wheel camper.

21.     When Plaintiff test drove the vehicle at the dealership before purchasing, he noticed that the tire pressure was low and inconsistent on some of the tires, as indicated by the TPMS. The dealership assured Plaintiff that there were no issues with the tires. The dealership promptly reinflated the tires to the recommended level.

22.     Within one week of purchasing the vehicle, Plaintiff Collins noticed that the tire pressure of the rear left exterior tire was low again. Plaintiff promptly reinflated the tires to the recommended level, as indicated on the door post tire inflation chart.

23.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—on a daily or weekly basis—and promptly inflated the tires to the recommended level. Plaintiff would use a compressor at his home and would sometimes need to stop at a service station to reinflate the tires. The rear left exterior tire lost air pressure faster than the others.

24.     Plaintiff used soapy water in a spray bottle to detect the location of the air leaks. Plaintiff determined that the leaks were coming from the valve stems on the four aluminum wheels. No leaks were detected on the tires themselves.

25.     Plaintiff brought the tire pressure issue to the attention of Fairway Ford during the vehicle's 5,000-mile service on February 11, 2019. Fairway Ford replaced the TPMS sensor and valve stem of the rear left exterior tire under warranty.

26.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level. The front left tire started experiencing more rapid deflation like the rear left exterior tire.

27.     At approximately 5,666 miles, on March 6, 2019, Plaintiff contacted Clarion Ford in Clarion, Pennsylvania about the tire pressure issue again. Clarion Ford replaced the TPMS sensor and valve stem of the front left wheel under warranty.

28.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels on a daily basis and promptly inflated the tires to the recommended level. The tire pressure would regularly drop by 35 PSI overnight. Plaintiff would often need to inflate the tires on each of the aluminum wheels every morning.

29.     At approximately 10,000 miles, on June 25, 2019, Plaintiff noticed that the front left tire was flat, and the TPMS indicated that the tire pressure for the front left tire was 35 PSI. Plaintiff reinflated the tires to the recommended levels and went to Clarion Ford. The service manager at the dealership informed Plaintiff that there were no mechanics available to replace the valve stem on the vehicle or to replace the tire with the spare. The service manager advised Plaintiff to inquire with a third-party tire shop to fix the issue. Plaintiff also asked about a Ford repair kit to fix the issue. The repair kit required grinding part of the aluminum wheel around the valve stem and using an epoxy to separate the aluminum wheel and steel valve stem. An employee at Clarion Ford stated that the dealership was not authorized to use the repair kit and that the only repair that

would be covered by the warranty would be another replacement of the valve stem. As an auto mechanic since 1967, Plaintiff knew that grinding the aluminum wheel for the repair kit could compromise the structural integrity of the wheel, and Plaintiff knew that replacing the steel valve stem with another steel valve stem would continue to corrode the aluminum wheel.

30.     Because Ford was unwilling or unable to effectively and permanently repair the four aluminum wheels, Plaintiff took the vehicle to Chris' Tire Services in Shippenville, Pennsylvania on June 25, 2019. Chris' Tire Services replaced the steel valve stems on the four aluminum tires with rubber valve stems for a total of $25.44. Defendant did not cover the repair under the vehicle's warranty. As of the filing of this complaint, since the installation of the rubber valve stems, the vehicle's tires have not needed to be reinflated.

31.     Plaintiff's wheels continue to show damage and discoloration from corrosion where the original steel valve stems met the aluminum wheels.

32.     Defendant has stated that it would replace only one of Plaintiff's corroded wheels under warranty.

33.     Plaintiff has expended time and money mitigating and repairing the defective tire valve stems, wheels, TPMS, and tires of his vehicle, and the value of Plaintiff's vehicle was decreased as a direct and proximate result of the defective tire valve stems, wheels, TPMS, and tires.

**B.  Plaintiff Newman**

34.     Plaintiff Newman ("Plaintiff" for purposes of this section) purchased a new 2018 Ford F-350 XL from Smithtown Ford of Smithtown, New York in or around June 2018.

35.     Plaintiff's vehicle is a dual-rear-wheel variant such that it has two sets of two wheels on either end of the rear axle. The front wheels and the exterior rear wheels are made of

aluminum; the interior rear wheels are made of steel. Each wheel was equipped with a steel valve stem.

36.     Plaintiff relied on Ford's advertising, marketing, warranties, and representations concerning safety, performance, durability, capability, reliability, and towing capacity when purchasing his vehicle.

37.     Plaintiff frequently noticed low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

38.     At approximately 16,626 miles, on or around May 28, 2019, Plaintiff brought his vehicle to Roadway Tire in Hauppauge, NY. Roadway Tire rebuilt the valve stem of the rear left exterior tire at a cost of $45.

39.     At approximately 20,594 miles, on or around July 3, 2019, Plaintiff brought his vehicle to Dave Kunzler Tire in Jefferson Station, NY. Dave Kunzler Tire rebuilt the valve stem of the rear left exterior tire at a cost of $58.90.

40.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

41.     At approximately 20,738 miles, on or around July 15, 2019, Plaintiff brought his vehicle to Roadway Tire. Roadway Tire replaced the TPMS sensor of the rear left exterior tire at a cost of $90.

42.     Plaintiff still continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

43.     Plaintiff was originally told the defect was not warrantied, but a year later, after Plaintiff tweeted to Ford's corporate office, the dealer from whom Mr. Newman purchased his vehicle replaced all the tire valves free of charge.

44.     Plaintiff's wheels continue to show damage and discoloration from corrosion where the original steel valve stems met the aluminum wheels.

45.     Plaintiff has expended time and money mitigating and repairing the defective tire valve stems, wheels, TPMS, and tires of his vehicle, and the value of Plaintiff's vehicle was decreased as a direct and proximate result of the defective tire valve stems, wheels, TPMS, and tires.

## FACTUAL ALLEGATIONS

### A. The Class Vehicles

46.     The Class Vehicles belong to Ford's F-Series Super Duty series, a collection of "workhorse" trucks targeted at those who use their vehicles for towing and hauling heavy loads.

47.     In 2017 and 2018, Defendant sold over 1.8 million vehicles in the F-Series in the United States.

48.     2017 and 2018 Super Duty vehicles are available in numerous sizes and variants with optional components and packages, including, without limitation: XL, XLT, Lariat, King Ranch, and Platinum. They are also available in single-rear-wheel ("SRW") and DRW variants. Aluminum wheels are optional or required on all variants; steel wheels are only available on certain XL and XLT variants.[2] Certain DRW variants may have both aluminum exterior wheels and steel interior wheels on the rear axle.

---

[2] 2017 Ford Super Duty Brochure, https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017; 2018 Ford Super Duty Brochure,

49.     2017 and 2018 Super Duty vehicles have a steel tire valve stem on each wheel. The tire valve stem is a small cylindrical tube which protrudes from the wheel, allowing an air pump to be attached to inflate the tire.

50.     2017 and 2018 Super Duty vehicles' tires must be filled with air to a precise air pressure recommended by the manufacturer to ensure fuel economy, tire longevity, safe vehicle handling, and the safety of the passengers and others. Low tire pressure is particularly harmful when using a vehicle to haul or tow heavy loads, which the Super Duty vehicles are advertised as being capable of doing. Ford's owner's manuals include numerous warnings and representations concerning tire pressure, including, without limitation[3]:

   a.   "Under-inflation is the most common cause of tire failures and may result in severe tire cracking, tread separation or blowout, with unexpected loss of vehicle control and increased risk of injury. Under-inflation increases sidewall flexing and rolling resistance, resulting in heat buildup and internal damage to the tire. It also may result in unnecessary tire stress, irregular wear, loss of vehicle control and accidents. A tire can lose up to half of its air pressure and not appear to be flat!"

   b.   "The Ford recommended tire inflation pressures can be found on the Tire Label, which is located on the B-pillar or the edge of the driver's door. This information can also be found on the Safety Compliance Certification Label (affixed to either the door hinge pillar, door-latch post, or the door edge that meets the door last post; next to the driver's seating position)."

   c.   "Ford strongly recommends maintaining these tire pressures at all times. Failure to follow the tire pressure recommendations can cause uneven treadwear patterns, reduced fuel economy, and adversely affect the way your vehicle handles."

   d.   "If you do not maintain the inflation pressure at the levels specified by Ford, your vehicle may experience a condition known as shimmy. Shimmy is a severe vibration and oscillation in the steering wheel after the vehicle travels over a bump or dip in the road that does not dampen out by itself. Shimmy may result from

---

https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2018.

[3] 2018 Ford F-350 Owner's Manual 390,
http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Super-Duty-Owners-Manual-version-2_om_EN-US_01_2018.pdf.

significant under-inflation of the tires, improper tires (load range, size, or type), or vehicle modifications such as lift-kits."

51.     A TPMS is mandated in all light motor vehicles in the United States. Ford equips all Super Duty vehicles with a TPMS that can alert the driver when the tires are not inflated to the proper pressure.

52.     Ford emphasizes the safety, performance, durability, capability, reliability, and towing capacity of the Super Duty series in its marketing and advertising, especially the advantages of using steel and aluminum components. Ford makes the following representations about the Super Duty series, without limitation[4]:

   a.  "We set the standard in truck capability. Now we've raised it even higher. This tough-as-nails workhorse is loaded with material innovation and advanced technology. Rust can't touch its all-new high-strength, military-grade, aluminum alloy body and cargo box. Its all-new, fully boxed, high-strength steel ladder frame is the strongest Super Duty pickup frame. Ever. Together, they form the foundation for the toughest, smartest, most capable Super Duty ever."

   b.  "It's astounding what an F-Series Super Duty will haul over its lifetime. Cinder block. Stumps. Pipe. Tools. Machinery. Landscaping material. Generators. 5th-wheel/gooseneck trailers. So we've made the cargo box of the all-new 2017 Super Duty even more capable. It's the first and only one in its class1 made from high-strength, military-grade, aluminum alloys. To handle the increased loading requirements and enhanced capability of a Super Duty workload, we re-engineered the cargo box and upgraded its panel thickness. It does not rust. It's more dent- and ding-resistant."

   c.  "Super Duty demands a foundation built for extremes. This all-new, fully boxed ladder frame – made of 95% high-strength steel – is engineered to be up to the task. With 6 times more high-strength steel than the previous generation, it's up to 24 times stiffer – helping to produce the best ride and steering of any Super Duty ever. That's just the kind of stability you need when you're towing a best-in-class 32,500 lbs. of heavy-duty machinery behind you."

   d.  "Towing numbers lead the class across the board. Best-in-class max. towing: Super Duty F-450 at a whopping 32,500 lbs. Best-in-class max. 5th-wheel towing: F-350 DRW at 27,500 lbs. And best-in-class conventional towing: F-350 DRW at 21,000

---

[4] 2017 Ford Super Duty Brochure,
https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017.

lbs. If you need to tow more than any other truck in the class, you'll be in a Super Duty. It's optimized for heavy hauling. So you can pull the most weight – confidently."

e.   "To help you handle it all, the 2017 F-Series Super Duty is our smartest and most capable towing machine. Ever. Providing you with an unprecedented level of towing confidence with even the largest loads."

f.   "Before the first truck rolls off the line, we'll have logged over 12 million cumulative miles of testing – more than any of its predecessors. Trust us when we say: The 2017 Super Duty is Built Ford Tough. In every way that matters."

53.     Plaintiffs and the proposed Class members relied on Defendant's representations when choosing to purchase the Class Vehicles.

**B.  The Defect**

54.     When an anode and a cathode come into contact with each other and an electrolytic solution (such as rain water, salt water, snow, or mud), galvanic corrosion occurs.

55.     In the presence of an electrolytic solution, stainless steel is a cathode, aluminum is an anode, and galvanic corrosion causes the aluminum to corrode.

56.     That aluminum and steel present a galvanic corrosion risk is well-known and accepted in the scientific community and vehicle manufacturing industry.

57.     The tire valve stems of the Class Vehicles are made of stainless steel while the wheels of the Class Vehicles are made of aluminum. The contact between the aluminum valve stem and the steel wheel, in the presence of an electrolytic solution, causes galvanic corrosion at the point of contact. This corrosion deteriorates the aluminum around the valve stem, creating a weak point where air can leak out of the tire continuously. The rate of air pressure loss may vary depending on the extent of the corrosion.

58.     Low tire pressure caused by the Defect can result in:

a.   Overheating of the tires, resulting in a blowout;

b.   Vehicle shimmying;

12

    c.   Increased tire wear, requiring that tires be replaced more frequently;

    d.   Decreased fuel efficiency; and

    e.   Hindered vehicle handling.

59.    The Defect therefore creates safety concerns for drivers, passengers, and others. Low tire pressure is particularly dangerous when using the Class Vehicles to haul or tow heavy loads, which the Class Vehicles are advertised as being capable of doing.

60.    The Defect requires drivers to visit dealerships and mechanics more frequently to repair or replace their tires, wheels, and valve stems.

61.    The Defect causes drivers to check and monitor their vehicles' tire pressure more frequently and to fill their tires with air more frequently.

62.    The constant air pressure loss causes the TPMS to constantly signal that air pressure is low, thereby preventing the TPMS from signaling when a rapid loss in air pressure has occurred due to some other occurrence, such as a tire puncture. This creates a greater safety hazard for the driver, passengers, and others. The Defect therefore renders the TPMS ineffective, and Defendant has failed to equip the Class Vehicles with a functional TPMS.

63.    The Defect also results in unsightly, discolored corrosion on the wheels.

64.    A reasonable consumer must be upset over the cost of repairing or replacing the components affected by the Defect replacing valve stems and nuts, particularly because there is no replacement interval noted for TPMS units or wheels in the owner's manual.

65.    Reasonable consumers expect that a vehicle – and its safety features – will last at least this long. The typical car on the road in the United States is 11.5 years old. The number of vehicles that are 16 to 24 years old is 44 million. The number of vehicles on the road that are at least 25 years old is about 14 million.

66.     Plaintiffs and the proposed Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

### C.  Consumer Complaints

67.     Owners of the Class Vehicles have reported the Defect to Ford, NHTSA, and other forums.

68.     The following are representative of complaints on the NHTSA website:

a.  2017 F-350: Tires not holding air pressure. Seeing this on the pass side front wheel/tire and the outer pass wheel/tire of the dually. Research indicates this could be due to corrosion caused by the valve stem and the aluminum wheel. This is a hazard particularly due to the fact this vehicle is built for heavy duty towing and tires must maintain proper air pressure. Tires are losing approx. 10PSI weekly. Ford should recall these vehicles and replace the valve stem assembly to prevent tire pressure loss. Numerous complaints can be found by researching Internet sources. The vehicle only has 13,000 miles on it.

b.  2017 F-350: At 10,000 miles the tire pressor sensor valves began leaking while the truck was stationary or driving causing low tire pressure. I have had the truck in to replace them 11 times and the issue still persists. Ford responded saying the problem was a dealer issue not theirs.

c.  2017 F-350: Valve stem leakage problem. Corrosion between valve stem and wheel due to dissimilar metal of wheel and stem. Causes sudden loss of pressure in tires.

d.  2017 F-350: Right outside dual rim will not hold air. Took Vehicle to Sakelaris Ford in Camdenton MO. First visit they replaced valve stem with a new one. A week later the wheel was still leaking. Took vehicle back and they said they could not find anything wrong. Wheel continued to leak. Service manager failed to initiate a claim with Ford and has since quit the dealer. Now the dealer's general manager refused to submit a warranty claim for the problem. The slow leak is well documented on various Ford forums on the Internet. Most have the same result; the dealers do not want to handle the situation. 2017 is the first model year that TPMS sensors were used on F350 Fords. There is a corrosion problem around the rim opening which leads to the low leak. I have checked the tire pressure both stationary and while driving using the TPMS.

e.  2017 F-350: The tire valve stem leaks. I have replaced 8 valve stems, and I have owned my truck approximately 1 year. In some instances the leak rate was very significant, requiring frequent stops to reinflate the tires. Ford has not addressed the problem--the company simply replaces the valve stems and leaks resume within 2-3 months. This was a major safety issue recently when we were towing a large load in the mountains of Colorado. Ford has refused to acknowledge the problem and

has refused to correct the root cause. The valve stems leak under all conditions--
while driving, while towing a load, while parked.

f.   2017 F-350: Sudden loss of tire pressure due to leaking TPMS valve stems. This is
the sixth similar failure since the vehicle was new in 3/2017. The five previous
replacements resulted in warranty replacement of the TPMS/ Valve stem unit.
There is a sudden loss of 20 to 30 pounds of tire pressure, followed by loss off 20
pounds per day. This has occurred both while driving, and while parked.

g.   2017 F-350: My F-350 DRW has developed leaks between the OEM aluminum
wheels and steel valve stems at only 12,435 miles. Took to my local dealer and
found I am not the only person with this issue. Because of the contact between the
dissimilar metals, the wheels have begun to corrode at a high pace causing pitting
around the valve stem. If it wasn't for my TPMS, I would have not known of the
leak all while towing my 18,000 lbs. 5th wheel RV. Ford has agreed to replace all
the wheels, however, I believe others should be informed to preclude any accidents.
A check of the super Duty form has indicated there are many owners across the US
that have this issue. Thanks Jeff.

h.   2017 F-350: This is a problem in dual rear wheel trucks the high pressure valve
stems are failing causing rapid air loss to front and rear outer wheels (aluminum
rims) This will cause tire failure resulting in crash or rollover this has happened in
motion and stationary.

i.   2017 F-350: Truck shaking, was told tire pressure was not being maintained. All
valve stems leaking since day I bought it. It took Ford 6 months to replace the valve
stems correctly. After this truck still shakes on rough road, if hit anything real ruff
truck violent shake have to stop to get it to stop (sic). Now since tire pressure can
be maintained since valve steams fixed. They tell me front tires need to replaced
from not maintaining tire pressures. That is why truck shakes. The truck has
shakenough since the first month I owned it March 2018, this has caused the front
tires to were on both outside edges (sic). The truck shakes so bad, I have ran off 7
times, ran two other cars off road, and pulled over for suspected DUI told officer
what happened and if I didn't get it fixed, he write me ticket defective equipment
and deem vehicle unsafe to operate (sic). Always in motion, any speed, any ruff
road even going across briggs anything that is not perfect smooth road (sic.)

j.   2018 F-350: Aluminum wheel valve stem leaking-tire loosing approximately 10
PSI per day. TPMS alarm notified me of a problem on highway when pressure
reached 50 PSIG (Spec=65) but identified the wrong tire because the sensors are
incorrectly mapped. Apparently this is a common failure on the 2017 and newer
Ford F350 DRW trucks as indicated her and in other online forums:
https://www.ford-trucks.com/forums/1495539-2017-dwr-recurring-valve-stem-
leaks.html. Based on this I am expecting leaks in the other three aluminum wheels
soon. The inner steel wheels apparently do not get the same problem. The frequency
of the problem detracts from the effectiveness of TPMS because it is always in
alarm.

k.  2018 F-350: Recurring valve stem leaks causing low air pressure while vehicle stationary or moving. Ford does not have a fix.

69.   The following are representative of complaints on other Internet forums[5]:

a.  I just got off the phone with ford, they are replacing only one wheel!, doing nothing about my defrost not working all last winter and they said the other rim looked like it had spots on in. (it was raining) and they think I put some sort of acid or chemical on it so they are not going to replace it. So now I'm stuck with onE wheel with clear peeling off and a bad valve stem….

b.  Hey everyone. 2017 F-350 DRW 4X4. 1 week ago the dealer replaced a leaking rim on my truck under warranty. Told me there was a known problem and they had another 17 DRW in the shop waiting to replace all 6 under warranty due to the hole in the rim of the valve stem/ TPMS was oversized. Got home tonight and noticed the same tire was low on pressure via the alert on the dash, bubble soap test, same area leaking at the valve stem. I sprayed the outer rear rim and saw a very small leak bubbling from the valve stem. I'll call dealer tomorrow, see what they say?

c.  It appears you are driving the 450 which has different rims and no TPMS. My understanding is that the leak occurs when the TPMS module attaches inside the rim to the valve stem…and the steel valve stem touches the alumninum rim in such a way that corrosion is formed and creates the leak. One of my rear tires was leaking 20 psi every day. I had my local tire shop fix it. They stated the corusion was the issue and they were able to clean the corrosion…apply sealant…and it no longer leaks. That was a couple of months ago. So it is interetesing that the Ford dealer replaced the valve stems and TPMS unit on my other two leaking rims. We'll see if it holds. So far so good. Previsou generation dually trucks did not use TPMS and had a different valve stem design, despite using the exact same rim. They did not have issues. Like I said, the inner wheels are made of steel and do not have the problem.

d.  I just got my truck from the dealer today, my tires leak, and my wheels have blistering clear coat…dealer says for will only replace one rim as they cost 1,400 each. My truck has been a nightmare and my dealer in barkhamsted, has been terrible…once they took my money on the sale, I've been getting the run around and the service manager theres like to gie people attidue.

e.  Hi guys, I've been happily racking up a fair number of miles on my 2017 DRW, and am almost completely out of patience with a recurring valve stem leak issue. Thus far, I've had at least 9 leaking valve stems replaced; most recently this past Thursday. All leaking valve stems have been Ford parts, and all have been front or outside rear tires. Thursday's replacements were for one front and one outer

---

[5] https://www.ford-trucks.com/forums/1495539-2017-drw-recurring-valve-stem-leaks.html

rear.Front seems to be holding up, but with only 800 miles since replacement, the rear is losing 3-5 PSI a night. Anyone have a similar experience? Thanks, Chris.

**D. Defendant's Knowledge of the Defect**

70. Plaintiff Collins' vehicle had low air pressure when he purchased it new from a Ford dealership—the tires had to be refilled before he drove it off the lot.  The dealership assured Plaintiff Collins that there were no issues with the tires.  Plaintiff first brought the Defect to the dealership's attention at the vehicle's 5,000-mile service, at which the Ford dealership replaced the vehicle's TPMS sensors and valve stems. Plaintiff continued experiencing problems and brought the vehicle to the Ford dealership twice more, resulting in more replacements of TPMS sensors and valve stems.

71. Plaintiff Newman first brought the Defect to the Ford dealership's attention, at which time the Ford dealership stated that any repair would not be covered under warranty. Plaintiff continued experiencing problems and brought the vehicle to third-party mechanics three more times, resulting in replacements of TPMS sensors and valve stems.

72. Consumer complaints tell similar stories—the Defect manifests quickly, with some owners bringing their vehicles to the dealership with fewer than 10,000 miles on the odometer.

73. Consumer complaints reveal that Defendant was aware of the Defect and that the valve stems were on national backorder:

> a. "The service manager at my dealer said that the valve stems are on national backorder, and that it will be at least 2 weeks before he gets more in. The part number has also changed. I'm not expecting too much from the new ones - I have one new stem, and it's the one leaking."
>
> b. "[T]he dealer said there have been notices sent out to the dealers about this issue, but nothing to the owners yet."
>
> c. "Ford is aware this is a problem for 2017 F-350 duallys."
>
> d. "So I went to the dealer today. Explained my issue's. Was told there was a warrantee notice for this problem."

74.     Defendant emphasizes the extensive pre-sale testing done on its vehicles in its marketing materials. Defendant's 2017 Super Duty brochure boasts: "Before the first truck rolls off the line, we'll have logged over 12 million cumulative miles of testing – more than any of its predecessors. Trust us when we say: The 2017 Super Duty is Built Ford Tough. In every way that matters."

75.     Defendant had access to early consumer complaints made exclusively to Ford, high levels of repair orders and warranty reimbursements, testing conducted in response to complaints, replacement part sales date, and aggregate data from Ford dealers.

76.     Defendant monitors complaints made to NHTSA which shows complaints of the Defect starting as early as January 2018.

77.     The frequency and extent of Defendant's knowledge of the Defect show that Defendant knew:

   a.   The Class Vehicles' tire valve stems and wheels are defective and prone to leaking;

   b.   The Defect is caused by galvanic corrosion; and

   c.   The Defect cannot be remedied by replacing the valve stems, wheels, TPMS.

78.     In the vast majority of cases, including Plaintiffs', despite Defendant's knowledge of the Defect and its root cause, Defendant continued its unfair and deceptive trade practices by providing ineffective repairs.

79.     Defendant was also on notice of the safety issues because there have been at least three prior NHTSA investigations or sanctioned recalls relating to defective valve stems or nuts. Indeed, a NHTSA report has found that "[t]ire problems are inherently hazardous to vehicle safety.

When these problems emerge in the pre-crash phase, the time window for attempting a crash avoidance maneuver is normally very small."[6]

**E.   The Class Vehicles' Warranties**

80.    All Class Vehicles come with a New Vehicle Limited Warranty (the "Warranty") which provides 3-year/36,000-mile coverage for certain repairs. The Warranty provides, in part (emphasis added):

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if: your Ford vehicle is properly operated and maintained, and was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> . . .
>
> This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, *is willing and able* to repair, replace, or adjust defective parts in the prescribed manner.
>
> . . .
>
> Nothing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type or design than the original, *so long as the vehicle functions properly with the replacement part*. Moreover, Ford and its authorized dealers are entitled to a *reasonable time and a reasonable number of attempts* within which to diagnose and repair any defect covered by this warranty.
>
> . . .

---

[6] NHTSA, *Tire-Related Factors in the Pre-Crash Phase* 15 (Apr. 2012), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811617.

> The New Vehicle Limited Warranty does not cover normal wear or worn out tires. Tires will not be replaced (*unless required by a warranty repair*) for wear or damage including:
>
> - tire damage from road hazard such as cuts, snags, bruises, bulges, puncture, and impact breaks
>
> - tire damage due to under or over inflation, tire chain use, racing, spinning (as when stuck in snow or mud), improper mounting or dismounting, or tire repair

81.     Defendant has used an unreasonable amount of time and an unreasonable number of attempts to repair Plaintiffs' vehicles. When Defendant has replaced parts on Plaintiffs' vehicles, they did not function properly. None of Defendant's repairs remedied the Defect which was due to a manufacturing defect in the factory-supplied tire valve stems, wheels, TPMS, and tires.

82.     The Defect directly results in tire wear beyond the amount of wear that could be expected from the normal use of the Class Vehicles. The wear of Plaintiffs' tires and the proposed Class members' tires as a result of the Defect is therefore covered by the Warranty.

83.     Plaintiffs and the proposed Class members have reported multiple attempts by Ford dealerships to repair or replace the tire valve stem or wheels only to continue experiencing the Defect.

84.     Ford has not recalled the Class Vehicles, has not provided dealerships with an effective remedy, has not allowed dealerships to use any other effective remedy, and has not acknowledged the Defect.

85.     Because Defendant was unwilling and/or unable to remedy the Defect, the Warranty has failed of its essential purpose and Defendant was obligated under the Warranty to repair the Defect using alternative parts or designs.

86.     The Warranty's time limit and exclusion of tire replacement and consequential damages are substantively and procedurally unconscionable because Defendant knowingly concealed the Defect and mandates an exclusive remedy that will not fix the Defect.

**CLASS ALLEGATIONS**

87.     Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

88.     The proposed Class is defined as follows:

> All persons in the United States who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "National Class").

> * * *

> All persons in New York who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "New York Class").

> * * *

> All persons in Pennsylvania who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "Pennsylvania Class").

89.     The Class excludes the following: Defendant, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.

90.     Plaintiffs reserve the right to modify, change, or expand the definitions of the proposed Class based upon discovery and further investigation.

91.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. There are hundreds of thousands of proposed Class members, evidenced by Defendant's sale of 1.8 million Super Duty vehicles. The proposed Class is ascertainable by records in Defendant's possession.

92.    *Commonality*: Questions of law or fact common to the class include, without limitation:

      a.   Whether the Class Vehicles are defective;

      b.   The scientific nature, causes, and results of the Defect;

      c.   Whether Defendant knew or should have known of the Defect;

      d.   Whether Defendant failed to disclose the Defect;

      e.   Whether Defendant concealed the Defect;

      f.   Whether a reasonable consumer would consider the Defect to be material;

      g.   Whether Defendant engaged in unfair or deceptive trade practices;

      h.   Whether Defendant breached the Warranty;

      i.   Whether Defendant engaged in fraud; and

      j.   Whether Defendant was unjustly enriched.

93.    *Typicality*: The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Class members. Plaintiffs purchased a new Class Vehicle and experienced the Defect within a short period time. Plaintiffs took their vehicles to Ford dealerships which were unable or unwilling to fix the Defect. Plaintiffs ultimately hired third-party mechanics to repair the Defect. Plaintiffs suffered economic damages in the form of out-of-pocket costs and diminution in value of the vehicle. Proposed Class members were injured and suffered damages in substantially the same manner as Plaintiffs, proposed Class members have the same claims against Defendant relating to the same course of conduct and the same Defect, and the proposed Class members are entitled to relief under the same legal theories asserted by Plaintiffs.

94.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and has no interests antagonistic to those of the proposed Class. Plaintiffs have retained

counsel experienced in the prosecution of complex class actions including, but not limited to, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

95.     *Predominance*: Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Common questions such as the extent, nature, causes, and results of the Defect, Defendant's knowledge and concealment of the Defect, and Defendant's liability predominate over individual questions such as measurement of economic damages.

96.     *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the proposed Class is impracticable and the amount at issue for each proposed Class member would not justify the cost of litigating individual claims. Should individual proposed Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

97.     *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

98.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

99.     Defendant has acted, and refused to act, on grounds generally applicable to the proposed Class, thereby making appropriate final equitable relief with respect to the proposed Class as a whole.

100.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## STATUTES OF LIMITATIONS

101.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

102.     Defendant is estopped from relying upon any statutes of limitations by reason of their fraudulent misrepresentation, suppression and concealment of material facts, and any applicable statutes of limitations are tolled by such conduct.

103.     Defendant did not inform Plaintiffs or proposed Class members about the Defect inherent in the Class Vehicles even though Defendant knew about the Defect at the time of purchase.

104.     When Plaintiffs and the proposed Class members experienced the Defect or sought repairs related to the Defect, Defendant concealed the true nature of the Defect and through words and actions misrepresented that repair or replacement of original parts would remedy the Defect.

105.     As a result of Defendant's omissions and misrepresentations, Plaintiffs and the proposed Class members did not know about the Defect inherent in the Class Vehicles.

## CAUSES OF ACTION

## COUNT 1

**Unfair and Deceptive Trade Practices in Violation of
N.Y. Gen. Bus. Law § 349, *et seq.*
(on behalf of Plaintiff Newman and the New York Class)**

106.    Plaintiff Newman ("Plaintiff" for purposes of this Count) hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

107.    Defendant's practices, acts, policies, and course of conduct, including its omissions, as described above, were intended to induce, and did induce, Plaintiff and New York Class members to purchase the above-mentioned Class Vehicles with the Defect.

108.    Defendant sold and/or leased the Class Vehicles knowingly concealing that they contained the Defect alleged herein.

109.    Defendant's acts are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer purchasing the Class Vehicles. Ford's aforementioned deceptive acts and practices are material, in part, because they concern an essential facet of the Class Vehicles' functionality and safety. The sale and distribution of the Class Vehicles in New York was a consumer-oriented act and thereby falls under the New York deceptive acts and practices statute, N.Y. Gen. Bus. Law § 349, *et seq.*

110.    Defendant's practices, acts, policies and course of conduct violated N.Y. Gen. Bus. Law § 349, *et seq.*

111.    At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff

and New York Class members the known corrosion Defect in the steel alloy TPMS valve stems and aluminum wheels and the known risks associated therewith.

112.     Thereafter, Defendant failed to disclose the Defect to Plaintiff and New York Class members either through warnings or recall notices and/or actively concealed from them the fact that the Class Vehicles' TPMS valve stems were defective, despite the fact that the company knew of the Defect at least since the time of manufacturing, when it created the valve stems and wheels out of dissimilar metal alloys that corrode and at least at the point where NHTSA began to record complaints about the Defect.

113.     Defendant forced Plaintiff and New York Class members to expend sums of money at its dealerships and/or third-party mechanics to repair and/or replace the defective valve stems and/or wheels and deflated tires on the Class Vehicles, despite the fact that Defendant had prior knowledge of the Defect at the time of purchase.

114.     Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, Defect would not be revealed to the consumer until after coverage expired thereunder.

115.     Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by replacing steel alloy valve stems and and/or aluminum wheels with the same materials that are subject to galvanic corrosion.

116.     Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that

the vehicles would not perform as intended, represented, and warranted and that the above described Defect would cause purchasers to incur significant out-of-pocket costs and expenses.

117.    The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the Defect.

118.    By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts and breached its duty not to do so.

119.    Members of the public were deceived by Defendant's failure to disclose and could not discover the Defect themselves before suffering their injuries.

120.    As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices Plaintiff and New York Class members have been damaged as alleged herein and are entitled to recover actual damages to the extent permitted by law, including in inflated price injury, repair and replacement costs, and/or statutory damages, in an amount to be proven at trial.

121.    Plaintiff and New York Class members seek restitution of the substantial sums of money they expended to replace their valve stems and/or wheels as a result of the Defect, which Defendant knew about prior to the sale of the Class Vehicles.

122.    Plaintiff and New York Class members also seek appropriate equitable relief, including an order requiring Ford to adequately disclose and remediate the Defect and an order enjoining Ford from incorporating the Defect into its vehicles in the future.

**COUNT 2**

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
73 P.S. § 201-1, *et seq.*
(on behalf of Plaintiff Collins and the Pennsylvania Class)**

123.     Plaintiff Collins ("Plaintiff" for purposes of this Count) hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

124.     The UTPCPL, 73 P.S. § 201-3, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2," including:

    a.  "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;"

    b.  "Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;"

    c.  "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;"

    d.  "Advertising goods or services with intent not to sell them as advertised;"

    e.  "Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;"

    f.  "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;"

    g.  "Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;" or

    h.  "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

125.     Plaintiff, Pennsylvania Class members, and Defendant are each a "person" within the meaning of 73 P.S. § 201-2(2).

126.     Defendant's "advertising, offering for sale, sale or distribution" of the Class Vehicles is "trade" and "commerce" within the meaning of 73 P.S. § 201-2(3).

28

127.    Defendant represented to Plaintiff and Pennsylvania Class members that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair.

128.    The Defect caused the Class Vehicles to fail to conform to the safety, performance, durability, capability, reliability, and towing capacity that Defendant represented and were therefore of a substantially lesser quality and value than Defendant represented.

129.    Defendant knew or should have known that the Class Vehicles could not conform to their representations because of the Defect.

130.    Defendant was under a duty to Plaintiff and Pennsylvania Class members to disclose the Defect because:

   a.  Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;

   b.  Plaintiff and Pennsylvania Class members could not reasonably have been expected to learn or discover the Defect;

   c.  Defendant knew that Plaintiff and Pennsylvania Class members could not reasonably have been expected to learn or discover the Defect; and

   d.  Defendant actively concealed the Defect and continually repairing or replacing tire valve stems, wheels, and TPMS sensors with knowledge that the Defect would not be remedied.

131.    The Defect and the facts concealed or not disclosed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

132.    Defendant concealed or did not disclose the Defect in order to induce Plaintiff and Pennsylvania Class members to purchase the Class Vehicles at a substantially higher price than what they would have paid.

133.    Plaintiff and Pennsylvania Class members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing the Class Vehicles.

29

134.    Defendant engaged in deceptive trade practices by representing and advertising that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair when they were defective and by knowingly and intentionally concealing from Plaintiff and Pennsylvania Class members that the Class Vehicles are defective when it had a duty to disclose the Defect.

135.    Defendant's deceptive trade practices occurred repeatedly in Defendants' course of business in Pennsylvania, Delaware, and throughout the United States.

136.    Plaintiff and Pennsylvania Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

137.    As a direct and proximate result of Defendant's conduct, Plaintiff and Pennsylvania Class members have been injured and sustained damages.

## COUNT 3

**Breach of Express Warranty**
**U.C.C. § 2-313**
**(on behalf of the New York Class, the Pennsylvania Class, and the National Class)**

138.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

139.    "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(a)(1).

140.    Defendant's Warranty is an express warranty within the meaning of U.C.C. § 2-313.

141.    The Defect constitutes a malfunction or failure of the valve stem, wheel, TPMS, and/or tire of the Class Vehicles during normal use.

142.     The Warranty covers the Defect and any damage proximately caused by the Defect, including effective and permanent repair or replacement of the tire valve stem, wheel, TPMS sensor, and tire.

143.     Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's Warranty when purchasing the Class Vehicles.

144.     Defendant breached the Warranty because Defendant is obligated to "repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use," Defendant is unwilling or unable to remedy the Defect within a reasonable time, and any attempt to remedy the Defect by Defendant has been ineffective.

145.     Defendant's breach deprived Plaintiffs and the proposed Class members of the benefit of the bargain.

146.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## COUNT 4

**Breach of Written Warranty in Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***
**(on behalf of the New York Class, the Pennsylvania Class, and the National Class)**

147.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

148.     Plaintiffs and the proposed Class members are each a "consumer" within the meaning of 15 U.S.C. § 2301(3).

149.     Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4) and (5).

150.   The Class Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

151.   Defendant's Warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

152.   The amount in controversy of each individual claim is greater than $25 and the amount in controversy is greater than $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

153.   The Defect constitutes a malfunction or failure of the valve stem, wheel, TPMS, and/or tire of the Class Vehicles during normal use.

154.   The Warranty covers the Defect and any damage proximately caused by the Defect, including effective and permanent repair or replacement of the tire valve stem, wheel, TPMS sensor, and tire.

155.   Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's Warranty when purchasing the Class Vehicles.

156.   Defendant breached the Warranty because Defendant is obligated to "repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use," Defendant is unwilling or unable to remedy the Defect within a reasonable time, and any attempt to remedy the Defect by Defendant has been ineffective.

157.   Defendant's breach deprived Plaintiffs and the proposed Class members of the benefit of the bargain.

158.   Accordingly, Defendant has also violated 15 U.S.C. § 45(a)(1) by way of 15 U.S.C. § 2310(b).

159.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## COUNT 5

### Unjust Enrichment
### (on behalf of the New York Class, the Pennsylvania Class, and the National Class)

160.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

161.    Defendant represented to Plaintiffs and the proposed Class members that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair.

162.    The Defect caused the Class Vehicles to fail to conform to the safety, performance, durability, capability, reliability, and towing capacity that Defendant represented and were therefore of a substantially lesser quality and value than Defendant represented.

163.    Defendant knew or should have known that the Class Vehicles could not conform to their representations because of the Defect.

164.    The Defect and the facts concealed or not disclosed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

165.    Defendant concealed or did not disclose the Defect in order to induce Plaintiffs and the proposed Class members to purchase the Class Vehicles at a substantially higher price than what they would have paid.

166.    Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing the Class Vehicles.

167.    Plaintiffs and the proposed Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

168.    Plaintiffs and the proposed Class members conferred substantial benefits on Defendant by purchasing defective Class Vehicles at a premium without receiving a vehicle that conformed to Defendant's representations.

169.    Defendant knowingly and willingly accepted and enjoyed these benefits.

170.    Defendant's retention of these benefits would be inequitable.

171.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Defendant as follows:

a.  For an order certifying the proposed Class, appointing Plaintiffs as the Representatives of the proposed Classes, and appointing the law firms representing Plaintiffs as counsel for the Classes;

b.  For a declaration that the tire valve stems and wheels the Class Vehicles are defective, that the remedial work necessary to correct the Defect is covered by the Warranty, and that the Warranty fails of its essential purpose;

c.  For compensatory damages, restitution, and/or refund of all funds acquired by Defendant from Plaintiffs and the proposed Class members as a result of Defendant's unlawful, unfair, deceptive, and unconscionable practices described herein, including actual, statutory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

d.  For punitive damages;

e.  Payment of costs and expenses of suit herein incurred;

f.  Both pre-and post-judgment interest on any amounts awarded;

g.  Payment of reasonable attorneys' fees and expert fees, and;

h.  Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

ROSENTHAL, MONHAIT & GODDESS, P.A.

*/s/ P. Bradford deleeuw*
P. Bradford deLeeuw (Del. Bar No. 3569)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899-1070
(302) 656-4433

OF COUNSEL:

Daniel C. Levin
Nicholas J. Elia
LEVIN SEDRAN BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500
dlevin@lfsblaw.com
nelia@lfsblaw.com

Nicholas A. Migliaccio
MIGLIACCIO & RATHOD LLP
412 H Street N.E., Suite 302
Washington, D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com

October 18, 2019

*Attorneys for Plaintiff*