**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES COLLINS and KEN NEWMAN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | C.A. No. 1:19-cv-01983-LPS |
| v. | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs James Collins and Ken Newman, individually and on behalf of all others similarly situated, bring this class action against Defendant, Ford Motor Company. For their Amended Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

**SUMMARY OF THE ACTION**

1.     Plaintiffs James Collins and Ken Newman ("Plaintiffs"), individually and on behalf of all others who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "proposed Class"), bring common law warranty claims and claims under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, N.Y. Gen. Bus. Law § 349, *et seq.*, and the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Rev. Code Ann. § 1345.01, *et seq.*, against Defendant Ford Motor Company ("Ford" or "Defendant").

2.     This consumer class action arises from the defective design and manufacture of the tire valve stems and wheels of 2017 and 2018 Ford F-350 trucks and their variants that are equipped with aluminum alloy wheels (the "Class Vehicles").

1

3.     The Firestone tire recall in the late 1990s, which was linked to more than 100 deaths from rollovers following tire tread-separation, prompted the United States Congress to enact legislation mandating the use of Tire Pressure Monitoring System ("TPMS") technology in all light motor vehicles (under 10,000 pounds) to help alert drivers of under-inflation events. This legislation mandated that by 2008 all new passenger car models must be equipped with a TPMS.

4.     Every wheel of the Class Vehicles has a valve stem which is affixed to a TPMS sensor and which is the point at which pressurized air may be added into the tire. The tire valve stems of the Class Vehicles are made of a steel alloy while the wheels of the Class Vehicles are made of an aluminum alloy. The contact between the steel valve stem and the aluminum wheel causes galvanic corrosion at the point of contact which corrodes the aluminum. This corrosion causes leaks, thereby causing the tires to continuously lose air pressure (the "Defect").

5.     Low tire pressure caused by the Defect adversely affects the Class Vehicles' fuel economy, tire longevity, vehicle handling, and safety of the passengers and others. An instantaneous tire deflation or blowout can cause drivers to lose control of their vehicles. Low tire pressure is particularly harmful when using the Class Vehicles to haul or tow heavy loads, which the Class Vehicles are advertised as being capable of doing.

6.     Class Vehicles have tires that must be inflated to 60 to 80 pounds per square inch (PSI). By contrast, most passenger vehicles must only be inflated to approximately 35 PSI. Most gas station air pumps cannot create high enough air pressure for Class Vehicles, and owners must seek out less common high-pressure air pumps when their Class Vehicles' tires lose air.

7.     Plaintiff Collins owns a 2018 Ford F-350 Lariat DRW. Plaintiff's vehicle experienced the Defect, forcing Plaintiff to refill his tires frequently, often daily. Plaintiff took his vehicle to a Ford dealership numerous times, resulting in inadequate repairs—including replacing

the TPMS sensors, replacement of the wheels, and replacement of the tire valve stems—which did not remedy the root cause of the Defect. Plaintiff ultimately hired a third-party mechanic to replace the defective steel valve stems with rubber valve stems. However, Plaintiff's wheels are still discolored and corroded due to the original and replacement defective steel valve stems.

8.      Plaintiff Newman owns a 2018 Ford F-350 DRW XL. Plaintiff's vehicle experienced the Defect, forcing Plaintiff to refill his tires frequently, often daily. Plaintiff complained to a Ford dealership numerous times, but the dealership did not remedy the root cause of the Defect and told him that any repair would not be covered by the warranty. Plaintiff has paid out of pocket for numerous repairs performed by third-party mechanics. Plaintiff's wheels are still discolored and corroded due to the Defect.

9.      Numerous consumer complaints to Ford and the National Highway Traffic Safety Administration ("NHTSA") describe experiences similar to Plaintiffs'.[1] Moreover, these complaints plainly demonstrate that Ford is aware of the root cause of the Defect, but—in most cases—mandates an exclusive but ineffective repair knowing that the corrosion and tire deflation will continue for the life of the Class Vehicle.

10.      By warranting, advertising, and selling the Class Vehicle with a defective tire valve stem and wheel, Defendant engages in deceptive and unfair trade practices and breaches the express and implied warranties Plaintiffs and the proposed Class members relied upon in the purchase of the Class Vehicles.

---

[1] *See, e.g.*, 2017 Ford F-350 Regular Cab, NHTSA, https://www.nhtsa.gov/vehicle/2017/FORD/F-350%252520REGULAR%252520CAB/PU%25252FRC/4x2; 2018 Ford F-350 Regular Cab, NHTSA, https://www.nhtsa.gov/vehicle/2018/FORD/F-350%252520REGULAR%252520CAB/PU%25252FRC/4x2.

11.     This case seeks protection and relief for the purchasers of the Class Vehicles for the harm they have suffered, and the safety risks they face, from the Defendant's unfair, unlawful, and deceptive trade practices.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

13.     This Court has general personal jurisdiction over Defendant because Defendant is incorporated in Delaware and is a resident of Delaware.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is subject to the Court's personal jurisdiction and is a resident of Delaware.

## PARTIES

15.     Plaintiff Collins is a resident of Pennsylvania.

16.     Plaintiff Newman is a resident of Florida.

17.     Defendant is a Delaware corporation with a principal place of business in Dearborn, Michigan. Defendant designs, manufactures, advertises, distributes, and sells vehicles throughout Delaware, the United States, and the world, including the Class Vehicles.

## PLAINTIFF FACTUAL ALLEGATIONS

### A. Plaintiff Collins

18.     Plaintiff Collins ("Plaintiff" for purposes of this section) purchased a new 2018 Ford F-350 Lariat DRW from Fairway Ford in Canfield, Ohio on August 10, 2018 for $76,101.76.

19.     Plaintiff's vehicle is a dual-rear-wheel ("DRW" or "dually") variant such that it has two sets of two wheels on either end of the rear axle. The front wheels and the exterior rear wheels are made of aluminum; the interior rear wheels are made of steel. Each wheel was equipped with a steel valve stem.

20.     Plaintiff relied on Ford's advertising, marketing, warranties, and representations concerning safety, performance, durability, capability, reliability, and towing capacity when purchasing his vehicle.

21.     Plaintiff previously worked as an auto mechanic and as a certified automotive diesel instructor. Plaintiff is now retired and often uses his vehicle to pull a fifth-wheel camper.

22.     When Plaintiff test drove the vehicle at the dealership before purchasing, he noticed that the tire pressure was low and inconsistent on some of the tires, as indicated by the TPMS. The dealership assured Plaintiff that there were no issues with the tires. The dealership promptly reinflated the tires to the recommended level.

23.     Within one week of purchasing the vehicle, Plaintiff Collins noticed that the tire pressure of the rear left exterior tire was low again. Plaintiff promptly reinflated the tires to the recommended level, as indicated on the door post tire inflation chart.

24.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—on a daily or weekly basis—and promptly inflated the tires to the recommended level. Plaintiff would use a compressor at his home and would sometimes need to

stop at a service station to reinflate the tires. The rear left exterior tire lost air pressure faster than the others.

25.     Plaintiff used soapy water in a spray bottle to detect the location of the air leaks. Plaintiff determined that the leaks were coming from the valve stems on the four aluminum wheels. No leaks were detected on the tires themselves.

26.     Plaintiff brought the tire pressure issue to the attention of Fairway Ford during the vehicle's 5,000-mile service on February 11, 2019. Fairway Ford replaced the TPMS sensor and valve stem of the rear left exterior tire under warranty.

27.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level. The front left tire started experiencing more rapid deflation like the rear left exterior tire.

28.     At approximately 5,666 miles, on March 6, 2019, Plaintiff contacted Clarion Ford in Clarion, Pennsylvania about the tire pressure issue again. Clarion Ford replaced the TPMS sensor and valve stem of the front left wheel under warranty.

29.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels on a daily basis and promptly inflated the tires to the recommended level. The tire pressure would regularly drop by 35 PSI overnight. Plaintiff would often need to inflate the tires on each of the aluminum wheels every morning.

30.     At approximately 10,000 miles, on June 25, 2019, Plaintiff noticed that the front left tire was flat, and the TPMS indicated that the tire pressure for the front left tire was 35 PSI. Plaintiff reinflated the tires to the recommended levels and went to Clarion Ford. The service manager at the dealership informed Plaintiff that there were no mechanics available to replace the

valve stem on the vehicle or to replace the tire with the spare. The service manager advised Plaintiff to inquire with a third-party tire shop to fix the issue. Plaintiff also asked about a Ford repair kit to fix the issue. The repair kit required grinding part of the aluminum wheel around the valve stem and using an epoxy to separate the aluminum wheel and steel valve stem. An employee at Clarion Ford stated that the dealership was not authorized to use the repair kit and that the only repair that would be covered by the warranty would be another replacement of the valve stem. As an auto mechanic since 1967, Plaintiff knew that grinding the aluminum wheel for the repair kit could compromise the structural integrity of the wheel, and Plaintiff knew that replacing the steel valve stem with another steel valve stem would continue to corrode the aluminum wheel.

31.    Because Ford was unwilling or unable to effectively and permanently repair the four aluminum wheels, Plaintiff took the vehicle to Chris' Tire Services in Shippenville, Pennsylvania on June 25, 2019. Chris' Tire Services replaced the steel valve stems on the four aluminum tires with rubber valve stems for a total of $25.44. Defendant did not cover the repair under the vehicle's warranty. As of the filing of this complaint, since the installation of the rubber valve stems, the vehicle's tires have not needed to be reinflated.

32.    Plaintiff's wheels continue to show damage and discoloration from corrosion where the original steel valve stems met the aluminum wheels.

33.    Defendant has stated that it would replace only one of Plaintiff's corroded wheels under warranty.

34.    Plaintiff has expended time and money mitigating and repairing the defective tire valve stems, wheels, TPMS, and tires of his vehicle, and the value of Plaintiff's vehicle was decreased as a direct and proximate result of the defective tire valve stems, wheels, TPMS, and tires.

B. **Plaintiff Newman**

35.     Plaintiff Newman ("Plaintiff" for purposes of this section) purchased a new 2018 Ford F-350 XL from Smithtown Ford of Smithtown, New York in or around June 2018.

36.     Plaintiff's vehicle is a dual-rear-wheel variant such that it has two sets of two wheels on either end of the rear axle. The front wheels and the exterior rear wheels are made of aluminum; the interior rear wheels are made of steel. Each wheel was equipped with a steel valve stem.

37.     Plaintiff relied on Ford's advertising, marketing, warranties, and representations concerning safety, performance, durability, capability, reliability, and towing capacity when purchasing his vehicle.

38.     Plaintiff frequently noticed low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

39.     At approximately 16,626 miles, on or around May 28, 2019, Plaintiff brought his vehicle to Roadway Tire in Hauppauge, NY. Roadway Tire rebuilt the valve stem of the rear left exterior tire at a cost of $45.

40.     At approximately 20,594 miles, on or around July 3, 2019, Plaintiff brought his vehicle to Dave Kunzler Tire in Jefferson Station, NY. Dave Kunzler Tire rebuilt the valve stem of the rear left exterior tire at a cost of $58.90.

41.     Plaintiff continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

42.     At approximately 20,738 miles, on or around July 15, 2019, Plaintiff brought his vehicle to Roadway Tire. Roadway Tire replaced the TPMS sensor of the rear left exterior tire at a cost of $90.

43.     Plaintiff still continued to frequently notice low tire pressures on each of the aluminum wheels at various times—often on a weekly basis—and promptly inflated the tires to the recommended level.

44.     Plaintiff was originally told the defect was not warrantied, but a year later, after Plaintiff tweeted to Ford's corporate office, the dealer from whom Mr. Newman purchased his vehicle replaced all the tire valves free of charge.

45.     Plaintiff's wheels continue to suffer from the same Defect because the Ford dealership installed valve stems wheels made of the same materials.

46.     Plaintiff's wheels continue to show damage and discoloration from corrosion where the original steel valve stems met the aluminum wheels.

47.     Plaintiff has expended time and money mitigating and repairing the defective tire valve stems, wheels, TPMS, and tires of his vehicle, and the value of Plaintiff's vehicle was decreased as a direct and proximate result of the defective tire valve stems, wheels, TPMS, and tires.

**FACTUAL ALLEGATIONS**

A.  **The Class Vehicles**

48.     The Class Vehicles belong to Ford's F-Series Super Duty series, a collection of "workhorse" trucks targeted at those who use their vehicles for towing and hauling heavy loads.

49.     In 2017 and 2018, Defendant sold over 1.8 million vehicles in the F-Series in the United States.

50.     2017 and 2018 Super Duty vehicles are available in numerous sizes and variants with optional components and packages, including, without limitation: XL, XLT, Lariat, King Ranch, and Platinum. They are also available in single-rear-wheel ("SRW") and DRW variants. Aluminum wheels are optional or required on all variants; steel wheels are only available on certain XL and XLT variants.[2] Certain DRW variants may have both aluminum exterior wheels and steel interior wheels on the rear axle.

51.     2017 and 2018 Super Duty vehicles have a steel tire valve stem on each wheel. The tire valve stem is a small cylindrical tube which protrudes from the wheel, allowing an air pump to be attached to inflate the tire.

52.     2017 and 2018 Super Duty vehicles' tires must be filled with air to a precise air pressure recommended by the manufacturer to ensure fuel economy, tire longevity, safe vehicle handling, and the safety of the passengers and others. Low tire pressure is particularly harmful when using a vehicle to haul or tow heavy loads, which the Super Duty vehicles are advertised as being capable of doing. Ford's owner's manuals include numerous warnings and representations concerning tire pressure, including, without limitation[3]:

    a.   "Under-inflation is the most common cause of tire failures and may result in severe tire cracking, tread separation or blowout, with unexpected loss of vehicle control and increased risk of injury. Under-inflation increases sidewall flexing and rolling resistance, resulting in heat buildup and internal damage to the tire. It also may result in unnecessary tire stress, irregular wear, loss of vehicle control and accidents. A tire can lose up to half of its air pressure and not appear to be flat!"

---

[2] 2017 Ford Super Duty Brochure, https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017; 2018 Ford Super Duty Brochure, https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2018.

[3] 2018 Ford F-350 Owner's Manual 390, http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Super-Duty-Owners-Manual-version-2_om_EN-US_01_2018.pdf.

b. "The Ford recommended tire inflation pressures can be found on the Tire Label, which is located on the B-pillar or the edge of the driver's door. This information can also be found on the Safety Compliance Certification Label (affixed to either the door hinge pillar, door-latch post, or the door edge that meets the door last post; next to the driver's seating position)."

c. "Ford strongly recommends maintaining these tire pressures at all times. Failure to follow the tire pressure recommendations can cause uneven treadwear patterns, reduced fuel economy, and adversely affect the way your vehicle handles."

d. "If you do not maintain the inflation pressure at the levels specified by Ford, your vehicle may experience a condition known as shimmy. Shimmy is a severe vibration and oscillation in the steering wheel after the vehicle travels over a bump or dip in the road that does not dampen out by itself. Shimmy may result from significant under-inflation of the tires, improper tires (load range, size, or type), or vehicle modifications such as lift-kits."

53. A TPMS is mandated in all light motor vehicles in the United States. Ford equips all Super Duty vehicles with a TPMS that can alert the driver when the tires are not inflated to the proper pressure.

54. Ford emphasizes the safety, performance, durability, capability, reliability, and towing capacity of the Super Duty series in its marketing and advertising, especially the advantages of using steel and aluminum components. Ford makes the following representations about the Super Duty series, without limitation[4]:

a. "We set the standard in truck capability. Now we've raised it even higher. This tough-as-nails workhorse is loaded with material innovation and advanced technology. Rust can't touch its all-new high-strength, military-grade, aluminum alloy body and cargo box. Its all-new, fully boxed, high-strength steel ladder frame is the strongest Super Duty pickup frame. Ever. Together, they form the foundation for the toughest, smartest, most capable Super Duty ever."

b. "It's astounding what an F-Series Super Duty will haul over its lifetime. Cinder block. Stumps. Pipe. Tools. Machinery. Landscaping material. Generators. 5th-wheel/gooseneck trailers. So we've made the cargo box of the all-new 2017 Super Duty even more capable. It's the first and only one in its class1 made from high-strength, military-grade, aluminum alloys. To handle the increased loading

---

[4] 2017 Ford Super Duty Brochure, https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017.

requirements and enhanced capability of a Super Duty workload, we re-engineered the cargo box and upgraded its panel thickness. It does not rust. It's more dent- and ding-resistant."

c.  "Super Duty demands a foundation built for extremes. This all-new, fully boxed ladder frame – made of 95% high-strength steel – is engineered to be up to the task. With 6 times more high-strength steel than the previous generation, it's up to 24 times stiffer – helping to produce the best ride and steering of any Super Duty ever. That's just the kind of stability you need when you're towing a best-in-class 32,500 lbs. of heavy-duty machinery behind you."

d.  "Towing numbers lead the class across the board. Best-in-class max. towing: Super Duty F-450 at a whopping 32,500 lbs. Best-in-class max. 5th-wheel towing: F-350 DRW at 27,500 lbs. And best-in-class conventional towing: F-350 DRW at 21,000 lbs. If you need to tow more than any other truck in the class, you'll be in a Super Duty. It's optimized for heavy hauling. So you can pull the most weight – confidently."

e.  "To help you handle it all, the 2017 F-Series Super Duty is our smartest and most capable towing machine. Ever. Providing you with an unprecedented level of towing confidence with even the largest loads."

f.  "Before the first truck rolls off the line, we'll have logged over 12 million cumulative miles of testing – more than any of its predecessors. Trust us when we say: The 2017 Super Duty is Built Ford Tough. In every way that matters."

55.  Defendant's representations imply that the Class Vehicles have the ability to conform with these representations under normal use, including that the tires will stay inflated.

56.  Plaintiffs and the proposed Class members relied on Defendant's representations when choosing to purchase the Class Vehicles.

**B.  The Defect**

57.  When an anode and a cathode come into contact with each other and an electrolytic solution (such as rain water, salt water, snow, or mud), galvanic corrosion occurs.

58.  In the presence of an electrolytic solution, stainless steel is a cathode, aluminum is an anode, and galvanic corrosion causes the aluminum to corrode.

59.  That aluminum and steel present a galvanic corrosion risk is well-known and accepted in the scientific community and vehicle manufacturing industry.

12

60.     The tire valve stems of the Class Vehicles are made of stainless steel while the wheels of the Class Vehicles are made of aluminum. The contact between the aluminum valve stem and the steel wheel, in the presence of an electrolytic solution, causes galvanic corrosion at the point of contact. This corrosion deteriorates the aluminum around the valve stem, creating a weak point where air can leak out of the tire continuously. The rate of air pressure loss may vary depending on the extent of the corrosion.

61.     Low tire pressure caused by the Defect can result in:

a.   Overheating of the tires, resulting in a blowout;

b.   Vehicle shimmying;

c.   Increased tire wear, requiring that tires be replaced more frequently;

d.   Decreased fuel efficiency; and

e.   Hindered vehicle handling.

62.     The Defect therefore creates safety concerns for drivers, passengers, and others. Low tire pressure is particularly dangerous when using the Class Vehicles to haul or tow heavy loads, which the Class Vehicles are advertised as being capable of doing.

63.     The Defect requires drivers to visit dealerships and mechanics more frequently to repair or replace their tires, wheels, and valve stems.

64.     The Defect causes drivers to check and monitor their vehicles' tire pressure more frequently and to fill their tires with air more frequently.

65.     The constant air pressure loss causes the TPMS to constantly signal that air pressure is low, thereby preventing the TPMS from signaling when a rapid loss in air pressure has occurred due to some other occurrence, such as a tire puncture. This creates a greater safety hazard for the driver, passengers, and others. The Defect therefore renders the TPMS ineffective, and Defendant has failed to equip the Class Vehicles with a functional TPMS.

66.     The Defect also results in unsightly, discolored corrosion on the wheels.

67.     A reasonable consumer must be upset over the cost of repairing or replacing the components affected by the Defect replacing valve stems and nuts, particularly because there is no replacement interval noted for TPMS units or wheels in the owner's manual.

68.     Reasonable consumers expect that a vehicle – and its safety features – will last at least this long. The typical car on the road in the United States is 11.5 years old. The number of vehicles that are 16 to 24 years old is 44 million. The number of vehicles on the road that are at least 25 years old is about 14 million.

69.     Plaintiffs and the proposed Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

**C. Consumer Complaints**

70.     Owners of the Class Vehicles have reported the Defect to Ford, NHTSA, and other forums.

71.     The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the Nation's highways.[5] All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns (which is backed by criminal penalties), thus Defendants have knowledge of any and all NHTSA complaints. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

---

[5] *See* https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm. Indeed, vehicle manufacturers are required by law to report any potential safety defects to the United States government.

72.     The following are representative of complaints on the NHTSA website:

| | |
|---|---|
| **Complaint Date:** January 22, 2018 | **NHTSA ID Number:** 11064071 |

**Summary:**
THIS IS A PROBLEM WITH DUEL REAR WHEEL TRUCKS THE HIGH PRESSURE
VALVE STEMS ARE FAILING CAUSING RAPID AIR LOSS TO FRONT AND REAR
OUTER WHEELS ( ALUMINUM RIMS ) THIS WILL CAUSE TIRE FAILURE
RESULTING IN CRASH AND OR ROLL OVER THIS HAS HAPPENED IN MOTION
AND STATIONARY *BF

| | |
|---|---|
| **Complaint Date:** May 30, 2018 | **NHTSA ID Number: 11098732** |

**Summary:**
DRW ALUMINUM WHEELS HAVE A CORROSION FAILURE WHERE THE TPMS
STEM MAKES CONTACT WITH THE RIM. THIS CAUSES AIR LEAKS AT THE STEM.
IN MY CASE THE LEAKS HAVE BEEN SLOW HOWEVER I FEAR USING THE
VEHICLE TO TOW AS A RAPID LOSS COULD CAUSE AN ACCIDENT. I'VE HAD
BOTH REAR STEMS REPLACED AND NOW THE FRONT IS STARTING TO LOOSE
PRESSURE. 410-487-2152

| | |
|---|---|
| **Complaint Date:** July 11, 2018 | **NHTSA ID Number:** 11110854 |

**Summary:**
TIRES LOSING AIR PRESSURE. DRIVING AND IN MOTION.

| | |
|---|---|
| **Complaint Date:** July 18, 2018 | **NHTSA ID Number:** 11112091 |

**Summary:**
AT 21000 MILES MY 2017 FORD F350 DRW HAD TWO WHEELS WITH TPMS
SENSORS LEAK AIR AT THE STEMS. BOTH WERE ALUMINUM RIMS. BOTH
STARTED LEAKING ON THE SAME DAY WHILE STATIONARY AND UNDER OUR
SHELTER WITH NO DAMAGE OF FOREIGN BODY COMING IN CONTACT WITH
STEMS OR RIMS. BOTH STEMS WERE REMOVED BY A PROFESSIONAL TIRE
DEALER AND FOUND THAT REPLACING GASKET DIDN'T SOLVE THIS PROBLEM.
THERE WERE NO REPLACEMENT STEMS AVAILABLE FOR THIS VEHICLE IN
STOCK OR FOR ORDER BECAUSE OF DEMAND FOR BY OTHER OWNERS
NEEDING REPLACEMENTS ALSO.

| | |
|---|---|
| **Complaint Date:** July 24, 2018 | **NHTSA ID Number:** 11113329 |

**Summary:**
TL* THE CONTACT OWNS A 2017 FORD F-350. WHILE THE VEHICLE WAS
STATIONARY, IT EXPERIENCED A SERIES OF SLOW LEAKS AND CORROSION
BETWEEN THE ALLOY WHEELS AND THE VALVE STEMS. THE CONTACT TOOK
THE VEHICLE TO AN INDEPENDENT TIRE FACILITY WHERE THE FAILURE WAS
CONFIRMED. THE REPAIR FACILITY REPLACED THE FRONT PASSENGER WHEEL
AND THE REAR OUTSIDE DRIVER SIDE WHEEL. THE CONTACT STATED THAT
THE FAILURE LATER OCCURRED WITH THE REAR OUTSIDE PASSENGER SIDE
WHEEL, WHICH WAS REPLACED. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURES. THE FAILURE MILEAGE WAS APPROXIMATELY 81,000.

**Complaint Date:** August 12, 2018          **NHTSA ID Number:** 11119442

**Summary:**
SUDDEN LOSS OF TIRE PRESSURE DUE TO LEAKING TPMS VALVE STEMS. THIS
IS THE SIXTH SIMILAR FAILURE SINCE THE VEHICLE WAS NEW IN 3/2017. THE
FIVE PREVIOUS OCCURRENCES RESULTED IN WARRANTY REPLACEMENT OF
THE TPMS/VALVE STEM UNIT. THERE IS A SUDDEN LOSS OF 20 TO 30 POUNDS
OF TIRE PRESSURE, FOLLOWED BY LOSS OF 20 POUNDS PER DAY. THIS HAS
OCCURRED BOTH WHILE DRIVING, AND WHILE PARKED.

**Complaint Date:** August 15, 2018          **NHTSA ID Number:** 11120093

**Summary:**
CONTINUED FAILURES OF VALUE STEMS ON THE WHEELS OF THIS TRUCK

**Complaint Date:** October 12, 2018          **NHTSA ID Number:** 11139993

**Summary:**
THE TIRE VALVE STEMS LEAK. I HAVE REPLACED 8 VALVE STEMS AND I HAVE
OWNED MY TRUST APPROXIMATELY 1 YEAR. IN SOME INSTANCES THE LEAK
RATE WAS VERY SIGNIFICANT, REQUIRING FREQUENT STOPS TO RE-INFLATE
THE TIRES. FORD HAS NOT ADDRESSED THE PROBLEM - THE COMPANY SIMPLY
REPLACES THE VALVE STEMS AND LEAKS RESUME WITHIN 2-3 MONTHS. THIS
WAS A MAJOR SAFETY ISSUE RECENTLY WHEN WE WERE TOWING A LARGE
LOAD IN THE MOUNTAINS OF COLORADO. FORD HAS REFUSED TO
ACKNOWLEDGE THE PROBLEM AND HAVE REFUSED TO CORRECT THE ROOT
CAUSE. / THE VALE STEMS LEAK UNDER ALL CONDITIONS - WHILE DRIVING,
WHILE TOWING A LOAD, WHILE PARKED.

**Complaint Date:** October 30, 2018          **NHTSA ID Number:** 11144049

**Summary:**
RIGHT SIDE REAR OUTSIDE DUAL RIM WILL NOT HOLD AIR. TOOK VEHICLE TO
SAKELARIS FORD IN CAMDENTON, MO. FIRST VISIT THEY REPLACED THE
VALVE STEM WITH A NEW ONE. A WEEK LATER THE WHEEL WAS STILL
LEAKING. TOOK VEHICLE BACK AND THEY SAID THEY COULD NOT FIND
ANYTHING WRONG. WHEEL CONTINUED TO LEAK. SERVICE MANAGER FAILED
TO INITIATE A CLAIM WITH FORD AND HAS SINCE QUIT THE DEALER. NOW THE
DEALER'S GENERAL MANAGER REFUSED TO SUBMIT A WARRANTY CLAIM FOR
THIS PROBLEM. THE SLOW LEAK IS WELL DOCUMENTED ON VARIOUS FORD
FORUMS ON THE INTERNET. MOST HAVE THE SAME RESULTS; THE DEALERS
DO NOT WANT TO HANDLE THE SITUATION. 2017 IS THE FIRST MODEL YEAR
THAT TPMS SENSORS WERE USED ON F350 FORDS. THERE IS A CORROSION
PROBLEM AROUND THE RIM OPENING WHICH LEADS TO THE SLOW LEAK. I
HAVE CHECKED THE TIRE PRESSURE BOTH STATIONARY AND WHILE DRIVING
USING THE TPMS MONITOR.

**Complaint Date:** October 30, 2018          **NHTSA ID Number:** 11144008

**Summary:**
VALVE STEM LEAKAGE PROBLEM ON WHEELS. CORROSION BETWEEN VALVE
STEM AND WHEEL DUE TO DISSIMILAR METAL OF WHEEL AND STEM. CAUSES
SUDDEN LOSS OF AIR PRESSURE IN TIRES.

**Complaint Date:** December 6, 2018          **NHTSA ID Number:** 11156481

**Summary:**
AT 10,000 MILES THE TIRE PRESSURE SENSOR VALVE STEMS BEGAN LEAKING
WHILE THE TRUCK WAS STATIONARY OR DRIVING CAUSING LOW TIRE
PRESSURE. I HAVE HAD THE TRUCK IN TO HAVE THEM REPLACED 11 TIMES
AND THE ISSUE STILL PERSISTS. FORD RESPONDED SAYING THE PROBLEM WAS
A DEALER ISSUE NOT THEIRS.

**Complaint Date:** December 18, 2018          **NHTSA ID Number:** 11162341

**Summary:**
TWO ISSUES.:

1) I HAD A HARD TIME KEEPING THE TIRES INFLATED TO THE CORRECT
LEVELS. AFTER FOUR OR FIVE TRIPS BACK TO THE DEALERSHIP, THIS ISSUE
MAY BE CORRECTED. IT WAS SO BAD I HAD TO PURCHASE A PUMP TO MAKE
SURE I COULD PUMP THE TIRES UP WHEN I WAS AWAY FROM HOME -- RVING.
THE DEALERSHIP WOULD HAVE TO HAVE KNOWN ABOUT THE ISSUE WHEN
THEY SOLD ME THE VEHICLE. THE TRUCK COULD LOSE 30 POUNDS OF TIRE
PRESSURE OVER A TWO WEEK PERIOD. I PURCHASED THE TRUCK IN MARCH
2018.

2) ON FOUR OR FIVE OCCASIONS THE TAILGATE HAS FALLEN OPEN. ONCE IT
DID IT WHILE I WAS TOWING A TRAILER. ON THE OTHER OCCASIONS IT HAS
FALLEN OPEN WITHOUT US KNOWING IT.

TODAY, MY WIFE USED THE TRUCK. SHE GOT HOME AND PARKED THE TRUCK
IN THE DRIVEWAY. WHEN SHE WENT OUT TO CHECK THE MAIL, SHE FOUND
THE TAIL GATE OPEN.

WE RECENTLY COMPLAINED TO FOX FORD, THE DEALERSHIP THAT SOLD US
THE TRUCK. WHEN MY WIFE TOOK THE TRUCK IN FOR AN OIL CHANGE, SHE
COMPLAINED ABOUT THE TAILGATE ISSUE. THEY CLAIMED THEY "TIGHTENED
IT" ACCORDING TO MY WIFE. WELL, THE PROBLEM HAS NOT BEEN SOLVED.

I WILL COMPLAIN AGAIN TO THEM TOMORROW.

**Complaint Date:** January 18, 2019        **NHTSA ID Number:** 11170696

**Summary:**
TRUCK SHAKING, WAS TOLD TIRE INFLATION WAS NOT BEING MAINTAINED. ALL VALVE STEMS LEAKING SINCE DAY I BOUGHT IT. ONE TIRE HAD FIX A FLAT IN IT WHEN I BOUGHT IT. IT TOOK FORD 6 MONTHS TO REPLACE VALVE STEMS CORRECTLY. AFTER THIS TRUCK STILL SHAKES ON ANY ROUGH ROAD, IF HIT ANY REAL RUFF TRUCK VIOLENT SHAKE HAVE TO STOP TO GET IT TO STOP. NOW SINCE TIRE PRESSURE CAN BE MAINTAINED SINCE VALOVE STEMS FIXED. THEY TELL ME FRONT TIRES NEED REPLACED FROM NOT MAINTAINING TIRE PRESSURES. THAT IS WHY TRUCK SHAKES. THE TRUCK HAS SHAKENOUGH SINCE THE FIRST MONTH I OWNED IT IT MARCH 2018, THIS HAS CAUSED FRONT TIRES TO WERE ON BOTH OUTSIDE EDGES. THE TRUCK SHAKES SO BAD, I HAVE RAN OFF 7 TIMES, RAN TWO OTHER CARS OFF ROAD, AND PULLED OVER FOR SUSPECTED DUI TOLD OFFICER WHAT HAPPENED AND IF I DIDN'T GET IT FIXED HE WRITE ME TICKET DEFECTIVE EQUIPMENT AND DEEM VEHICLE UNSAFE TO OPERATE. ALWAYS IN MOTION, ANY SPEED, ANY RUFF ROAD, EVEN GOING ACROSS BRIGGS ANYTHING THAT IS NOT PERFECT SMOOTH ROAD

**Complaint Date:** February 15, 2019        **NHTSA ID Number:** 11180364

**Summary:**
PROBLEM # 1 VEHICLE SHAKES VIOLENTLY WHILE IN MOTION WHEN IT HITS A SMALL BUMP OR POTHOLE. IT HAS HAPPENED FEW TIME IN THE LAST COUPLE WEEKS, ON 2/15/2019 WHILE DRIVING AT ABOUT 60 MHM THE VEHICLE HIT A SMALL BUMP AND THE VEHICLE FROM SUSPENSION STARTED TO SHAKE SO VIOLENTLY THAT I ALMOST LOST CONTROL OF IT. I HAD TO APPLY BRAKES AND REDUCE SPEED BY 50% TO STOP THE SHAKING.

PROBLEM 2. FRONT AIR MONITORING SYSTEM FAILURE. IT ALL THE SUDDEN STARTED TO GIVE WRONG READINGS IN BOTH FRONT TIRES.

**Complaint Date:** March 23, 2019        **NHTSA ID Number:** 11191053

**Summary:**
TIRES NOT HOLDING AIR PRESSURE. SEEING THIS ON THE PASS SIDE FRONT WHEEL/TIRE, AND THE OUTER PASS WHEEL/TIRE OF THE REAR DUALLY. RESEARCH INDICATES THIS COULD BE DUE TO CORROSION CAUSED BY THE STEEL VALVE STEM AND THE ALUMINUM WHEEL. THIS IS A HAZARD PARTICULARLY DUE TO THE FACT THIS VEHICLE IS BUILT FOR HEAVY DUTY TOWING AND TIRES MUST MAINTAIN PROPER AIR PRESSURE. TIRES ARE LOSING APPROX. 10PSI WEEKLY. FORD SHOULD RECALL THESE VEHICLES AND REPAIR/REPLACE THE VALVE STEM ASSEMBLY TO PREVENT TIRE PRESSURE LOSS. NUMEROUS COMPLAINTS OF SAME CAN BE FOUND BY RESEARCHING INTERNET SOURCES. THE VEHICLE ONLY HAS 13,500 MILES ON IT.

**Complaint Date:** April 22, 2019          **NHTSA ID Number:** 11202957

**Summary:**
CAST ALUMINUM WHEELS LEAKING AIR FROM AREA AROUND STEEL VALVE
STEM WHERE CORROSION IS OCCURRING. ALL HAVE BEEN REPLACED ONCE
AND ONE WAS REPLACED TWICE. VEHICLE HAS 29K MILES. THE AIR LOSS HAS
BEEN BOTH SLOW AND QUICK. THIS IS DANGEROUS AS I PULL A 13,000 POUND
TRAILER. DEALERS ARE AWARE OF MANY CASES. FORD WILL NOT REPLACE
WHEELS WITH A SAFE PRODUCT AND CONTINUES TO REPLACE WITH THE
SAME DEFECTIVE WHEEL AND VALVE.

**Complaint Date:** April 24, 2019          **NHTSA ID Number:** 11203346

**Summary:**
AIR LEAKING FROM TIRE VALVE STEMS. I HAVE HAD TO TAKE THE TRUCK TO
THE DEALER SEVERAL TIMES FOR THE SAME ISSUE.

**Complaint Date:** June 13, 2019          **NHTSA ID Number:** 11219698

**Summary:**
TIRE VALVE STEMS ARE LEAKING REPEATEDLY, NEW VALVE STEMS WILL
START LEAKING SOMETIMES THE NEXT DAY. WHILE THE DEALER IS
REPLACING THE STEMS UNDER WARRANTY (BUMPER TO BUMPER) THIS IS
CAUSING A DANGEROUS CONDITION. 25% OF AIR CAN BE LOSSED OVERNIGHT.
IT SEEMS LIKE THE MANUFACTURER IS TRYING TO RUN OUT THE WARRANTY
AND LEAVE CONSUMERS WITH THE PRICE OF THE STEMS AFTERWARD. IN
15,000 MILES, ONE OF THE WHEELS ON THE TRUCK HAS HAD 4 STEMS PUT IN.

**Complaint Date:** July 9, 2019          **NHTSA ID Number:** 11230518

**Summary:**
WHEELS ON THIS VEHICLE ARE ALUMINUM ALLOY WITH STEEL VALVE STEMS.
BECAUSE THESE ARE TWO DIFFERENT METALS THEY ARE CAUSING A
CORROSION PROBLEM WHICH IN TURN IS CAUSING THE TIRES TO LOSE AIR
PRESSURE. IF DRIVING AT HIGHWAY SPEEDS I BELIEVE THAT IF THE WHEELS
AND TIRES WERE TO LOOSE PRESSURE QUICKLY THAT THIS COULD LEAD TO A
CATASTROPHIC ACCIDENT. I HAVE READ OF MULTIPLE COMPLAINTS OF THIS
SAME PROBLEM ON THE INTERNET BUT FORD HAS DONE NOTHING TO
ADDRESS THE ISSUE. CORROSION APPEARS TO BE NOT ONLY INSIDE THE
VALVE STEMS BUT ALSO ON THE WHEELS. REPLACING THE VALVE STEM WILL
DO NOTHING TO CORRECT THE PROBLEM AS IT WILL ONLY OCCUR AGAIN AND
AGAIN. I BOUGHT THIS VEHICLE IN MAY OF 2018 (NEW) AND IT HAS BEEN
OCCURRING EVER SINCE. I CONTINUALLY HAVE TO FILL THEM WITH AIR.
TOOK IT INTO FORD UNDER WARRANTY BUT THE ISSUE WAS NOT CORRECTED.

**Complaint Date:** September 18, 2019          **NHTSA ID Number:** 11256441

**Summary:**
2017 VEHICLE WITH 26,000 MILES. OUTSIDE DRW WHEELS, BOTH PASSENGER
AND DRIVER SIDE HAVE PRESENTED CORROSION AND ARE LOSING AIR
PRESSURE STATIONARY AND IN MOTION DUE TO INCOMPATIBLE METALS ON

RIM AND VALVE STEM. RECALL NEEDS TO BE ENACTED AND RIMS NEED TO BE REPLACED.

**Complaint Date:** October 3, 2019          **NHTSA ID Number:** 11265938

**Summary:**
I HAD A CONTINUAL LOST OF AIR PRESSURE IN ONE OF MY TIRES DURING THE REMOVAL OF THE ORIGINAL EQUIPMENT TIRE AT DISCOUNT TIRES THE MANAGER INFORMED ME THAT THE CHROME WAS FLAKING OFF ON THE INSIDE OF THE RIMS WHERE THE TIRE SEALS TO THE RIM A POSSIBLE MANUFACTURE DEFECT THAT COULD CAUSE POOR SEAL AND DEFLATION OF MY TIRES OR WORST. IF NOT FOR THE NAIL PUNCTURING MY TIRE I WOULD NOT HAVE FOUND THE DEFECT IN THE MANUFACTURING OF THE 4 RIMS ON MY TRUCK. BECAUSE THE ONE TIRE WAS NOT REPAIRABLE I HAD TO BUY 4 NEW TIRES THAT HOW I FOUND THAT ALL 4 OF THE RIMS HAD THE SAME DEFECT. MY CONCERN IS MY TRUCK SAFE TO DRIVE ON THESE 4 RIMS OR COULD I HAVE A TIRE FAILURE BECAUSE OF A LOST OF TIRE SEAL FROM THE CHROME FLAKING OFF INSIDE THE RIMS. I DO HAVE PICTURE.

**Complaint Date:** October 9, 2019          **NHTSA ID Number:** 11267241

**Summary:**
THE WHEELS AND VALVE STEMS ARE CORRODING AND LEAKING AIR. THE OEM WHEELS HAVE BEEN REPLACED UNDER WARRANTEE WITH NEW OEM BUT THEY HAVE STARTED LEAKING AGAIN. ON LONG DRIVES WHEN THE TIRES HEAT UP THE LEAK SEEMS TO GET WORSE. I HAVE TO AIR UP THE TIRES EVERY DAY BEFORE DRIVING THE TRUCK. I'M CONCERNED ABOUT THE AIR LOSS WHEN I'M HAULING HEAVY LOADS.

**Complaint Date:** November 6, 2019          **NHTSA ID Number:** 11278337

**Summary:**
MY VEHICLE ALUMINUM RIMS ALL CORRODED AROUND THE VALVE STEM CAUSING THEM TO LOOSE AIR. FORD REPLACED ALL THE RIMS AT 10,000 MILES. THEY TOLD ME THEY WERE AWARE OF THE PROBLEM AND HAD CORRECTED IT. AT 39,500 MILES THE NEW RIMS DID THE SAME THING CORRODING AROUND THE VALVE STEM CAUSING THE AIR TO LEAK OUT. THE PROBLEM WAS NOT CORRECTED.FORD AGREED THE RIMS WERE DEFECTIVE AND WOULD ONLY REPLACE THEM IF I PAID OVER HALF OF THE NEW COST. I AM ALWAYS FEARFUL THAT THE TIRES WILL LOOSE AIR AT HIGH SPEED AND CAUSE A CRASH.

73.   The following are representative of complaints on other Internet forums[6]:

a.   I just got off the phone with ford, they are replacing only one wheel!, doing nothing about my defrost not working all last winter and they said the other rim looked like it had spots on in. (it was raining) and they think I put some sort of acid or chemical on it so they are not going to replace it. So now I'm stuck with onE wheel with clear peeling off and a bad valve stem….

b.   Hey everyone. 2017 F-350 DRW 4X4. 1 week ago the dealer replaced a leaking rim on my truck under warranty. Told me there was a known problem and they had another 17 DRW in the shop waiting to replace all 6 under warranty due to the hole in the rim of the valve stem/ TPMS was oversized. Got home tonight and noticed the same tire was low on pressure via the alert on the dash, bubble soap test, same area leaking at the valve stem. I sprayed the outer rear rim and saw a very small leak bubbling from the valve stem. I'll call dealer tomorrow, see what they say?

c.   It appears you are driving the 450 which has different rims and no TPMS. My understanding is that the leak occurs when the TPMS module attaches inside the rim to the valve stem…and the steel valve stem touches the alumninum rim in such a way that corrosion is formed and creates the leak. One of my rear tires was leaking 20 psi every day. I had my local tire shop fix it. They stated the corusion was the issue and they were able to clean the corrosion…apply sealant…and it no longer leaks. That was a couple of months ago. So it is intereteesing that the Ford dealer replaced the valve stems and TPMS unit on my other two leaking rims. We'll see if it holds. So far so good. Previsou generation dually trucks did not use TPMS and had a different valve stem design, despite using the exact same rim. They did not have issues. Like I said, the inner wheels are made of steel and do not have the problem.

d.   I just got my truck from the dealer today, my tires leak, and my wheels have blistering clear coat…dealer says for will only replace one rim as they cost 1,400 each. My truck has been a nightmare and my dealer in barkhamsted, has been terrible…once they took my money on the sale, I've been getting the run around and the service manager theres like to gie people attidue.

e.   Hi guys, I've been happily racking up a fair number of miles on my 2017 DRW, and am almost completely out of patience with a recurring valve stem leak issue. Thus far, I've had at least 9 leaking valve stems replaced; most recently this past Thursday. All leaking valve stems have been Ford parts, and all have been front or outside rear tires. Thursday's replacements were for one front and one outer rear.Front seems to be holding up, but with only 800 miles since replacement, the rear is losing 3-5 PSI a night. Anyone have a similar experience? Thanks, Chris.

---

[6] https://www.ford-trucks.com/forums/1495539-2017-drw-recurring-valve-stem-leaks.html

D. **Defendant's Knowledge of the Defect**

74.     Plaintiff Collins' vehicle had low air pressure when he purchased it new from a Ford dealership—the tires had to be refilled before he drove it off the lot. Plaintiff first brought the Defect to the dealership's attention at the vehicle's 5,000-mile service, at which the Ford dealership replaced the vehicle's TPMS sensors and valve stems. Plaintiff continued experiencing problems and brought the vehicle to the Ford dealership twice more, resulting in more replacements of TPMS sensors and valve stems.

75.     Plaintiff Newman first brought the Defect to the Ford dealership's attention, at which time the Ford dealership stated that any repair would not be covered under warranty. Plaintiff continued experiencing problems and brought the vehicle to third-party mechanics three more times, resulting in replacements of TPMS sensors and valve stems.

76.     Consumer complaints tell similar stories—the Defect manifests quickly, with some owners bringing their vehicles to the dealership with fewer than 10,000 miles on the odometer.

77.     Consumer complaints reveal that Defendant was aware of the Defect and that the valve stems were on national backorder:

a.    "The service manager at my dealer said that the valve stems are on national backorder, and that it will be at least 2 weeks before he gets more in. The part number has also changed. I'm not expecting too much from the new ones - I have one new stem, and it's the one leaking."

b.    "[T]he dealer said there have been notices sent out to the dealers about this issue, but nothing to the owners yet."

c.    "Ford is aware this is a problem for 2017 F-350 duallys."

d.    "So I went to the dealer today. Explained my issue's. Was told there was a warrantee notice for this problem."

78.     Defendant emphasizes the extensive pre-sale testing done on its vehicles in its marketing materials. Defendant's 2017 Super Duty brochure boasts: "Before the first truck rolls

off the line, we'll have logged over 12 million cumulative miles of testing – more than any of its predecessors. Trust us when we say: The 2017 Super Duty is Built Ford Tough. In every way that matters."

79.     Defendant had access to early consumer complaints made exclusively to Ford, high levels of repair orders and warranty reimbursements, testing conducted in response to complaints, replacement part sales date, and aggregate data from Ford dealers.

80.     Defendant monitors complaints made to NHTSA which shows complaints of the Defect starting as early as January 2018.

81.     The frequency and extent of Defendant's knowledge of the Defect show that Defendant knew:

    a.  The Class Vehicles' tire valve stems and wheels are defective and prone to leaking;

    b.  The Defect is caused by galvanic corrosion; and

    c.  The Defect cannot be remedied by replacing the valve stems, wheels, TPMS.

82.     In the vast majority of cases, including Plaintiffs', despite Defendant's knowledge of the Defect and its root cause, Defendant continued its unfair and deceptive trade practices by providing ineffective repairs.

83.     Defendant was also on notice of the safety issues because there have been at least three prior NHTSA investigations or sanctioned recalls relating to defective valve stems or nuts. Indeed, a NHTSA report has found that "[t]ire problems are inherently hazardous to vehicle safety. When these problems emerge in the pre-crash phase, the time window for attempting a crash avoidance maneuver is normally very small."[7] One such investigation even involved Ford F-350 vehicles. In that investigation, NHTSA found that "[s]everal drivers of F- series pickup trucks that

---

[7] NHTSA, *Tire-Related Factors in the Pre-Crash Phase* 15 (Apr. 2012), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811617.

experienced a front tire valve stem that popped out completely, lost control of their vehicles, often swerving into the next lane." *See* NHTSA Office of Defects Investigation Resume, Investigation No. EA02-018.

**E. The Class Vehicles' Warranties**

84.     All Class Vehicles come with a New Vehicle Limited Warranty (the "Warranty") which provides 3-year/36,000-mile coverage for certain repairs. The Warranty provides, in part (emphasis added):

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if: your Ford vehicle is properly operated and maintained, and was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.
>
> . . .
>
> This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, *is willing and able* to repair, replace, or adjust defective parts in the prescribed manner.
>
> . . .
>
> Nothing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type or design than the original, *so long as the vehicle functions properly with the replacement part*. Moreover, Ford and its authorized dealers are entitled to a *reasonable time and a reasonable number of attempts* within which to diagnose and repair any defect covered by this warranty.
>
> . . .
>
> The New Vehicle Limited Warranty does not cover normal wear or worn out tires. Tires will not be replaced (*unless required by a warranty repair*) for wear or damage including:

- tire damage from road hazard such as cuts, snags, bruises, bulges, puncture, and impact breaks

- tire damage due to under or over inflation, tire chain use, racing, spinning (as when stuck in snow or mud), improper mounting or dismounting, or tire repair

85.     Defendant has used an unreasonable amount of time and an unreasonable number of attempts to repair Plaintiffs' vehicles. When Defendant has replaced parts on Plaintiffs' vehicles, they did not function properly. None of Defendant's repairs remedied the Defect which was due to a manufacturing defect in the factory-supplied tire valve stems, wheels, TPMS, and tires.

86.     The Defect directly results in tire wear beyond the amount of wear that could be expected from the normal use of the Class Vehicles. The wear of Plaintiffs' tires and the proposed Class members' tires as a result of the Defect is therefore covered by the Warranty.

87.     Plaintiffs and the proposed Class members have reported multiple attempts by Ford dealerships to repair or replace the tire valve stem or wheels only to continue experiencing the Defect.

88.     Ford has not recalled the Class Vehicles, has not provided dealerships with an effective remedy, has not allowed dealerships to use any other effective remedy, and has not acknowledged the Defect.

89.     Because Defendant was unwilling and/or unable to remedy the Defect, the Warranty has failed of its essential purpose and Defendant was obligated under the Warranty to repair the Defect using alternative parts or designs.

90.     The Warranty's time limit and exclusion of tire replacement and consequential damages are substantively and procedurally unconscionable because Defendant knowingly concealed the Defect and mandates an exclusive remedy that will not fix the Defect.

## CLASS ALLEGATIONS

91.     Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

92.     The proposed Class is defined as follows:

> All persons in the United States who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "National Class").

> * * *

> All persons in New York who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "New York Class").

> * * *

> All persons in Ohio who purchased and/or leased a 2017 or 2018 Ford F-350 equipped with aluminum wheels (the "Ohio Class").

93.     The Class excludes the following: Defendant, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.

94.     Plaintiffs reserve the right to modify, change, or expand the definitions of the proposed Class based upon discovery and further investigation.

95.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. There are hundreds of thousands of proposed Class members, evidenced by Defendant's sale of millions of Super Duty vehicles. The proposed Class is ascertainable by records in Defendant's possession.

96.     *Commonality*: Questions of law or fact common to the class include, without limitation:

   a.   Whether the Class Vehicles are defective;

   b.   The scientific nature, causes, and results of the Defect;

    c.   Whether Defendant knew or should have known of the Defect;

    d.   Whether Defendant failed to disclose the Defect;

    e.   Whether Defendant concealed the Defect;

    f.   Whether a reasonable consumer would consider the Defect to be material;

    g.   Whether Defendant engaged in unfair or deceptive trade practices;

    h.   Whether Defendant violated the DTPA;

    i.   Whether Defendant breached the Warranty;

    j.   Whether Defendant engaged in fraud; and

    k.   Whether Defendant was unjustly enriched.

97.    *Typicality*: The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Class members. Plaintiffs purchased a new Class Vehicle and experienced the Defect within a short period time. Plaintiffs took their vehicles to Ford dealerships which were unable or unwilling to fix the Defect. Plaintiffs ultimately hired third-party mechanics to repair the Defect. Plaintiffs suffered economic damages in the form of out-of-pocket costs and diminution in value of the vehicle. Proposed Class members were injured and suffered damages in substantially the same manner as Plaintiffs, proposed Class members have the same claims against Defendant relating to the same course of conduct and the same Defect, and the proposed Class members are entitled to relief under the same legal theories asserted by Plaintiffs.

98.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and has no interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

99.    *Predominance*: Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Common questions such as

the extent, nature, causes, and results of the Defect, Defendant's knowledge and concealment of the Defect, and Defendant's liability predominate over individual questions such as measurement of economic damages.

100. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the proposed Class is impracticable and the amount at issue for each proposed Class member would not justify the cost of litigating individual claims. Should individual proposed Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

101. *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

102. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

103. Defendant has acted, and refused to act, on grounds generally applicable to the proposed Class, thereby making appropriate final equitable relief with respect to the proposed Class as a whole.

104. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

28

**STATUTES OF LIMITATIONS**

105.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

106.    Defendant is estopped from relying upon any statutes of limitations by reason of their fraudulent misrepresentation, suppression and concealment of material facts, and any applicable statutes of limitations are tolled by such conduct.

107.    Defendant did not inform Plaintiffs or proposed Class members about the Defect inherent in the Class Vehicles even though Defendant knew about the Defect at the time of purchase.

108.    When Plaintiffs and the proposed Class members experienced the Defect or sought repairs related to the Defect, Defendant concealed the true nature of the Defect and through words and actions misrepresented that repair or replacement of original parts would remedy the Defect.

109.    As a result of Defendant's omissions and misrepresentations, Plaintiffs and the proposed Class members did not know about the Defect inherent in the Class Vehicles.

**CAUSES OF ACTION**

**COUNT 1**

**Unfair and Deceptive Trade Practices in Violation of**
**N.Y. Gen. Bus. Law § 349, *et seq*.**
**(on behalf of Plaintiff Newman and the New York Class)**

110.    Plaintiff Newman ("Plaintiff" for purposes of this Count) hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

111.    Defendant's practices, acts, policies, and course of conduct, including its omissions, as described above, were intended to induce, and did induce, Plaintiff and New York Class members to purchase the above-mentioned Class Vehicles with the Defect.

112.    Defendant sold and/or leased the Class Vehicles knowingly concealing that they contained the Defect alleged herein.

113.    Defendant's acts are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer purchasing the Class Vehicles. Ford's aforementioned deceptive acts and practices are material, in part, because they concern an essential facet of the Class Vehicles' functionality and safety. The sale and distribution of the Class Vehicles in New York was a consumer-oriented act and thereby falls under the New York deceptive acts and practices statute, N.Y. Gen. Bus. Law § 349, *et seq.*

114.    Defendant's practices, acts, policies and course of conduct violated N.Y. Gen. Bus. Law § 349, *et seq.*

115.    At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff and New York Class members the known corrosion Defect in the steel alloy TPMS valve stems and aluminum wheels and the known risks associated therewith.

116.    Thereafter, Defendant failed to disclose the Defect to Plaintiff and New York Class members either through warnings or recall notices and/or actively concealed from them the fact that the Class Vehicles' TPMS valve stems were defective, despite the fact that the company knew of the Defect at least since the time of manufacturing, when it created the valve stems and wheels out of dissimilar metal alloys that corrode and at least at the point where NHTSA began to record complaints about the Defect.

30

117.    Defendant forced Plaintiff and New York Class members to expend sums of money at its dealerships and/or third-party mechanics to repair and/or replace the defective valve stems and/or wheels and deflated tires on the Class Vehicles, despite the fact that Defendant had prior knowledge of the Defect at the time of purchase.

118.    Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, Defect would not be revealed to the consumer until after coverage expired thereunder.

119.    Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by replacing steel alloy valve stems and and/or aluminum wheels with the same materials that are subject to galvanic corrosion.

120.    Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described Defect would cause purchasers to incur significant out-of-pocket costs and expenses.

121.    The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the Defect.

122.    By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts and breached its duty not to do so.

123.     Members of the public were deceived by Defendant's failure to disclose and could not discover the Defect themselves before suffering their injuries.

124.     As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices Plaintiff and New York Class members have been damaged as alleged herein and are entitled to recover actual damages to the extent permitted by law, including in inflated price injury, repair and replacement costs, and/or statutory damages, in an amount to be proven at trial.

125.     Plaintiff and New York Class members seek restitution of the substantial sums of money they expended to replace their valve stems and/or wheels as a result of the Defect, which Defendant knew about prior to the sale of the Class Vehicles.

126.     Plaintiff and New York Class members also seek appropriate equitable relief, including an order requiring Ford to adequately disclose and remediate the Defect and an order enjoining Ford from incorporating the Defect into its vehicles in the future.

## COUNT 2

**Violations of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code Ann. § 1345.01, *et seq.***
**(on behalf of Plaintiff Collins and the Ohio Class)**

127.     Plaintiff Collins ("Plaintiff" for purposes of this Count) hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

128.     The CSPA, Ohio Rev. Code Ann. § 1345.02, prohibits any "unfair or deceptive act or practice in connection with a consumer transaction," including representing:

   a.   "That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;"

   b.   "That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;"

   c.   "That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;" and

d. "That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false."

129.

130.    Plaintiff, Ohio Class members, and Defendant are each a "person" within the meaning of Ohio Rev. Code Ann. § 1345.01(B).

131.    Plaintiff and Ohio Class members are each a "consumer" within the meaning of Ohio Rev. Code Ann. § 1345.01(D).

132.    Defendant is  a "supplier" within the meaning of Ohio Rev. Code Ann. § 1345.01(C).

133.    Defendant's sale and/or lease of the Class Vehicles is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

134.    Defendant represented to Plaintiff and Ohio Class members that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair.

135.    The Defect caused the Class Vehicles to fail to conform to the safety, performance, durability, capability, reliability, and towing capacity that Defendant represented and were therefore of a substantially lesser quality and value than Defendant represented.

136.    Defendant knew or should have known that the Class Vehicles could not conform to their representations because of the Defect.

137.    Defendant was under a duty to Plaintiff and Ohio Class members to disclose the Defect because:

a. Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;

b. Plaintiff and Ohio Class members could not reasonably have been expected to learn or discover the Defect;

c. Defendant knew that Plaintiff and Ohio Class members could not reasonably have been expected to learn or discover the Defect; and

33

      d.   Defendant actively concealed the Defect and continually repairing or replacing tire valve stems, wheels, and TPMS sensors with knowledge that the Defect would not be remedied.

138.    The Defect and the facts concealed or not disclosed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

139.    Defendant concealed or did not disclose the Defect in order to induce Plaintiff and Ohio Class members to purchase the Class Vehicles at a substantially higher price than what they would have paid.

140.    Plaintiff and Ohio Class members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing the Class Vehicles.

141.    Defendant engaged in deceptive trade practices by representing and advertising that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair when they were defective and by knowingly and intentionally concealing from Plaintiff and Ohio Class members that the Class Vehicles are defective when it had a duty to disclose the Defect.

142.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that acts and omissions similar to kinds alleged in this Complaint, including, but not limited to, the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act.  These cases include, but are not limited to, the following:

      a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

      b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

      c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

      d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

       e.     *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

       f.     *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

       g.     *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

       h.     *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

       i.     *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

       j.     *Khouri v. Don Lewis* (OPIF #100001995);

       k.     *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

       l.     *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and,

       m.     *Brown v. Spears* (OPIF #10000403).

143.    Ford committed these and other deceptive acts in connection with the marketing and sale of the Class Vehicles.

144.    Defendant's deceptive trade practices occurred repeatedly in Defendants' course of business in Ohio throughout the United States.

145.    Plaintiff and Ohio Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

146.    As a direct and proximate result of Defendant's conduct, Plaintiff and Ohio Class members have been injured and sustained damages.

## COUNT 3

**Breach of Express Warranty**
**U.C.C. § 2-313**
**(on behalf of the New York Class, the Ohio Class, and the National Class)**

147.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

148.    "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(a)(1).

149.    Defendant's Warranty is an express warranty within the meaning of U.C.C. § 2-313.

150.    The Defect constitutes a malfunction or failure of the valve stem, wheel, TPMS, and/or tire of the Class Vehicles during normal use.

151.    The Warranty covers the Defect and any damage proximately caused by the Defect, including effective and permanent repair or replacement of the tire valve stem, wheel, TPMS sensor, and tire.

152.    Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's Warranty when purchasing the Class Vehicles.

153.    Defendant breached the Warranty because Defendant is obligated to "repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use," Defendant is unwilling or unable to remedy the Defect within a reasonable time, and any attempt to remedy the Defect by Defendant has been ineffective.

154.    Defendant's breach deprived Plaintiffs and the proposed Class members of the benefit of the bargain.

36

155.     Defendant's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

156.     The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class.

157.     Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale.

158.     Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

159.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## COUNT 4

### Breach of Implied Warranty in Tort/Strict Liability
### (on behalf of the Ohio Class and the National Class)

160.     Plaintiff Collins ("Plaintiff" for purposes of this Count) hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

161.     The Defect is inherent in all Class Vehicles because the TPMS and the use of aluminum wheels and steel tire valve stems are part of the design of the Class Vehicles.

162.     Defendant manufactured, distributed, and sold the Class Vehicles with the Defect.

163.     The Defect causes the Class Vehicles to be unreasonably dangerous during normal use because the risk of an accident caused by low tire pressure causing serious bodily injury or death outweighs the utility of the Class Vehicles.

164.     Defendant failed to warn Plaintiff and Class members of the Defect.

165.     Defendant's breach deprived Plaintiffs and the proposed Class members of the benefit of the bargain.

166.     Defendant's attempt to disclaim these implied warranties is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

167.     Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale.

168.     As a direct and proximate result of Defendant's conduct, Plaintiff and the proposed Class members have been injured and sustained damages.

## COUNT 5

**Breach of Written Warranty in Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***
**(on behalf of the New York Class, the Ohio Class, and the National Class)**

169.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

170.     Plaintiffs and the proposed Class members are each a "consumer" within the meaning of 15 U.S.C. § 2301(3).

171.    Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4) and (5).

172.    The Class Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

173.    Defendant's Warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

174.    The amount in controversy of each individual claim is greater than $25 and the amount in controversy is greater than $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

175.    The Defect constitutes a malfunction or failure of the valve stem, wheel, TPMS, and/or tire of the Class Vehicles during normal use.

176.    The Warranty covers the Defect and any damage proximately caused by the Defect, including effective and permanent repair or replacement of the tire valve stem, wheel, TPMS sensor, and tire.

177.    Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's Warranty when purchasing the Class Vehicles.

178.    Defendant breached the Warranty because Defendant is obligated to "repair, replace, or adjust all parts on [the] vehicle that malfunction or fail during normal use," Defendant is unwilling or unable to remedy the Defect within a reasonable time, and any attempt to remedy the Defect by Defendant has been ineffective.

179.    Defendant's breach deprived Plaintiffs and the proposed Class members of the benefit of the bargain.

180.     Accordingly, Defendant has also violated 15 U.S.C. § 45(a)(1) by way of 15 U.S.C. § 2310(b).

181.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## COUNT 6

### Unjust Enrichment
### (on behalf of the New York Class, the Ohio Class, and the National Class)

182.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

183.     Defendant represented to Plaintiffs and the proposed Class members that the Class Vehicles were safe, high-quality, durable, reliable, merchantable, and in good repair.

184.     The Defect caused the Class Vehicles to fail to conform to the safety, performance, durability, capability, reliability, and towing capacity that Defendant represented and were therefore of a substantially lesser quality and value than Defendant represented.

185.     Defendant knew or should have known that the Class Vehicles could not conform to their representations because of the Defect.

186.     The Defect and the facts concealed or not disclosed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

187.     Defendant concealed or did not disclose the Defect in order to induce Plaintiffs and the proposed Class members to purchase the Class Vehicles at a substantially higher price than what they would have paid.

188.     Plaintiffs and the proposed Class members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing the Class Vehicles.

189.     Plaintiffs and the proposed Class members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

190.     Plaintiffs and the proposed Class members conferred substantial benefits on Defendant by purchasing defective Class Vehicles at a premium without receiving a vehicle that conformed to Defendant's representations.

191.     Defendant knowingly and willingly accepted and enjoyed these benefits.

192.     Defendant's retention of these benefits would be inequitable.

193.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Class members have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Defendant as follows:

a.  For an order certifying the proposed Class, appointing Plaintiffs as the Representatives of the proposed Classes, and appointing the law firms representing Plaintiffs as counsel for the Classes;

b.  For a declaration that the tire valve stems and wheels the Class Vehicles are defective, that the remedial work necessary to correct the Defect is covered by the Warranty, and that the Warranty fails of its essential purpose;

c.  For compensatory damages, restitution, and/or refund of all funds acquired by Defendant from Plaintiffs and the proposed Class members as a result of Defendant's unlawful, unfair, deceptive, and unconscionable practices described herein, including actual, statutory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

d.  For punitive damages;

e.  Payment of costs and expenses of suit herein incurred;

f.  Both pre-and post-judgment interest on any amounts awarded;

g.  Payment of reasonable attorneys' fees and expert fees, and;

h.  Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.


Dated: January 17, 2020                    */s/ P. Bradford deLeeuw*

                                           P. Bradford deLeeuw (Del. Bar No. 3569)
                                           DELEEUW LAW LLC
                                           1301 Walnut Green Road
                                           Wilmington, DE 19807
                                           Phone: (302) 274-2180
                                           Email: brad@deleeuwlaw.com

                                           Daniel C. Levin
                                           Nicholas J. Elia
                                           LEVIN SEDRAN BERMAN LLP
                                           510 Walnut Street, Suite 500
                                           Philadelphia, PA 19106
                                           Phone: (215) 592-1500
                                           Fax: (215) 592-4663
                                           Email: dlevin@lfsblaw.com
                                                     nelia@lfsblaw.com

                                           Nicholas A. Migliaccio
                                           Jason S. Rathod
                                           MIGLIACCIO & RATHOD LLP
                                           412 H Street N.E., Suite 302
                                           Washington, D.C. 20002
                                           Phone: (202) 470-3520
                                           Fax: (202) 800-2730
                                           Email: nmigliaccio@classlawdc.com

                                           *Attorneys for Plaintiffs*